Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

YAHOO! INC., a Delaware corporation,
            *Plaintiff-Appellee,*

v.

LA LIGUE CONTRE LE RACISME ET L'ANTISEMITISME, a French association; L'UNION DES ETUDIANTS JUIFS DE FRANCE, a French association,
            *Defendants-Appellants.*

No. 01-17424

D.C. No.
CV-00-21275-JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy Fogel, District Judge, Presiding

Argued and Submitted
March 24, 2005—San Francisco, California

Filed January 12, 2006

Before: Mary M. Schroeder, Chief Judge, and
Warren J. Ferguson, Diarmuid F. O'Scannlain,
Michael Daly Hawkins, A. Wallace Tashima,
William A. Fletcher, Raymond C. Fisher, Ronald M. Gould,
Richard A. Paez, Richard R. Clifton, and Carlos T. Bea,
Circuit Judges.

2 OPINIONS;
Per Curiam Opinion;
Opinion by Judge William A. Fletcher;
Concurrence by Judge Ferguson;
Concurrence by Judge O'Scannlain;
Concurrence by Judge Tashima;
Partial Concurrence and Partial Dissent by Judge Fisher

## COUNSEL

Randol Schoenberg, Burris & Schoenberg, Los Angeles, California; Robert A. Christopher, Coudert Brothers, Palo Alto, California; Mark D. Lebow, Sokolow Carreras, New York, New York, for the defendants-appellants.

Michael Traynor, Cooley, Godward, Castro, Huddelson & Tatum, San Francisco, California; Robert C. Vanderet, O'Melveney & Myers, Los Angeles, California, for the plaintiff-appellee.

Ann Brick, ACLU, San Francisco, California; John B. Morris, Jr., Alan B. Davidson, Center for Democracy & Technology, Washington, D.C., for amici American Booksellers Foundation for Free Expression, et al.

Jodie L. Kelley, Brian Hauck, Jenner & Block, Washington, D.C.; Stephen A. Bokat, Robin S. Conrad, Joshua A. Ulman, National Chamber Litigation Center, Washington, D.C., for amici Chamber of Commerce of the United States, et al., and for amicus Center for Democracy.

---

## OPINION

PER CURIAM:

A majority of the en banc court (Judge W.A. Fletcher, joined by Chief Judge Schroeder and Judges Hawkins, Fisher, Gould, Paez, Clifton, and Bea) concludes that the district court had personal jurisdiction over the defendants. Of that majority, three judges (Chief Judge Schroeder, and Judges W.A. Fletcher and Gould) conclude that the action should be dismissed for lack of ripeness. Five judges (Judge Fisher, joined by Judges Hawkins, Paez, Clifton, and Bea) conclude that the case is ripe for adjudication. The three remaining

judges (Judges Ferguson, O'Scannlain, and Tashima) conclude that the action should be dismissed because the district court lacked personal jurisdiction over the defendants.

A majority of the en banc court having voted therefor, the judgment of the district court is **REVERSED** and the case **REMANDED** with directions to dismiss the action without prejudice.

YAHOO! INC., a Delaware
corporation,
              *Plaintiff-Appellee,*

              v.

LA LIGUE CONTRE LE RACISME ET
L'ANTISEMITISME, a French
association; L'UNION DES
ETUDIANTS JUIFS DE FRANCE, a
French association,
              *Defendants-Appellants.*

No. 01-17424

D.C. No.
CV-00-21275-JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy Fogel, District Judge, Presiding

Argued and Submitted
March 24, 2005—San Francisco, California

Filed January 12, 2006

Before: Mary M. Schroeder, Chief Judge, and
Warren J. Ferguson, Diarmuid F. O'Scannlain,
Michael Daly Hawkins, A. Wallace Tashima,
William A. Fletcher, Raymond C. Fisher, Ronald M. Gould,
Richard A. Paez, Richard R. Clifton, and Carlos T. Bea,
Circuit Judges.

Opinion by Judge William A. Fletcher

W. FLETCHER, Circuit Judge, with whom SCHROEDER, Chief Circuit Judge, and GOULD, Circuit Judge, join as to the entire opinion, and with whom HAWKINS, FISHER, PAEZ, CLIFTON and BEA, Circuit Judges, join as to Parts I and II:

Yahoo!, an American Internet service provider, brought suit in federal district court in diversity against La Ligue Contre Le Racisme et L'Antisemitisme ("LICRA") and L'Union des Etudiants Juifs de France ("UEJF") seeking a declaratory judgment that two interim orders by a French court are unrecognizable and unenforceable. The district court held that the exercise of personal jurisdiction over LICRA and UEJF was proper, that the dispute was ripe, that abstention was unnecessary, and that the French orders are not enforceable in the United States because such enforcement would violate the First Amendment. The district court did not reach the question whether the orders are recognizable. LICRA and UEJF appeal only the personal jurisdiction, ripeness, and abstention holdings. A majority of the en banc panel holds, as explained in Part II of this opinion, that the district court properly exercised personal jurisdiction over LICRA and UEJF. A plurality of the panel concludes, as explained in Part III of this opinion, that the case is not ripe under the criteria of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). We do not reach the abstention question.

## I.  Background

Yahoo! is a Delaware corporation with its principal place of business in California. Through its United States-based website yahoo.com, Yahoo! makes available a variety of Internet services, including a search engine, e-mail, web page hosting, instant messaging, auctions, and chat rooms. While some of these services rely on content created by Yahoo!, others are forums and platforms for user-generated content.

Yahoo! users can, for example, design their own web pages, share opinions on social and political message boards, play fantasy baseball games, and post items to be auctioned for sale. Yahoo! does not monitor such user-created content before it is posted on the web through Yahoo! sites.

Yahoo!'s United States website is written in English. It targets users in the United States and relies on servers located in California. Yahoo!'s foreign subsidiaries, such as Yahoo! France, Yahoo! U.K., and Yahoo! India, have comparable websites for their respective countries. The Internet addresses of these foreign-based websites contain their two-letter country designations, such as fr.yahoo.com, uk.yahoo.com, and in.yahoo.com. Yahoo!'s foreign subsidiaries' sites provide content in the local language, target local citizens, and adopt policies that comply with local law and customs. In actual practice, however, national boundaries are highly permeable. For example, any user in the United States can type www.fr.yahoo.com into his or her web browser and thereby reach Yahoo! France's website. Conversely, any user in France can type www.yahoo.com into his or her browser, or click the link to Yahoo.com on the Yahoo! France home page, and thereby reach yahoo.com.

Sometime in early April 2000, LICRA's chairman sent by mail and fax a cease and desist letter, dated April 5, 2000, to Yahoo!'s headquarters in Santa Clara, California. The letter, written in English, stated in part:

> [W]e are particularly choked [sic] to see that your Company keeps on presenting every day hundreds of nazi symbols or objects for sale on the Web.

> This practice is illegal according to French legislation and it is incumbent upon you to stop it, at least on the French Territory.

> Unless you cease presenting nazi objects for sale within 8 days, we shall size [sic] the competent jurisdiction to force your company to abide by the law.

On April 10, five (rather than eight) days after the date on the letter, LICRA filed suit against Yahoo! and Yahoo! France in the Tribunal de Grande Instance de Paris. On April 20, UEJF joined LICRA's suit in the French court. LICRA and UEJF used United States Marshals to serve process on Yahoo! in California.

After a hearing on May 15, 2000, the French court issued an "interim" order on May 22 requiring Yahoo! to "*take all necessary measures to dissuade and render impossible* any access [from French territory] via Yahoo.com to the Nazi artifact auction service and to any other site or service that may be construed as constituting an apology for Nazism or a contesting of Nazi crimes" (emphasis added).[1] Among other things, the French court required Yahoo! to take particular specified actions "[b]y way of interim precautionary measures." Yahoo! was required "to cease all hosting and availability in the territory of [France] from the 'Yahoo.com' site . . . of messages, images and text relating to Nazi objects, relics, insignia, emblems and flags, or which evoke Nazism," and of "Web pages displaying text, extracts, or quotes from 'Mein Kampf' and the '[Protocols of the Elders of Zion]' " at two specified Internet addresses. Yahoo! was further required to remove from "all browser directories accessible in the territory of the French Republic" the "index heading entitled 'negationists' " and any link "bringing together, equating, or

---

[1]The French court's orders are written in French. We quote from the English translation provided in the record. Counsel for LICRA and UEJF contended at oral argument that the words "all necessary measures" (underlined and italicized above) are a mistranslation of the French text. The original French for the entire phrase (italicized above) is "prendre toutes les mesures de nature à dissuader et à rendre impossible." Counsel contended that the words "toutes les mesures de nature à" are more accurately translated as "all reasonable (or available) measures."

presenting directly or indirectly as equivalent" sites about the Holocaust and sites by Holocaust deniers.

The May 22 interim order required Yahoo! France (as distinct from Yahoo!) to remove the "negationists" index heading and the link to negationist sites, described above, from fr.yahoo.com. The order further required Yahoo! France to post a warning on fr.yahoo.com stating to any user of that website that, in the event the user accessed prohibited material through a search on Yahoo.com, he or she must "desist from viewing the site concerned[,] subject to imposition of the penalties provided in French legislation or the bringing of legal action against him."

The order stated that both Yahoo! and Yahoo! France were subject to a penalty of 100,000 Euros per day of delay or per confirmed violation, and stated that the "possibility of liquidation of the penalties thus pronounced" was "reserve[d]." The order also awarded 1 Franc in "provisional damages," payable by Yahoo! and Yahoo! France to UEJF, and awarded an additional 1 Franc against Yahoo! and Yahoo! France for expenses under Article 700 of the New Code of Civil Procedure. The French court also awarded 10,000 Francs against Yahoo! for expenses under Article 700, payable to LICRA, and 10,000 Francs each against Yahoo! and Yahoo! France under Article 700 (a total of 20,000 Francs), payable to UEJF.

Yahoo! objected to the May 22 order. It contended, among other things, that "there was no technical solution which would enable it *to comply fully* with the terms of the court order." (Emphasis added.) In response, the French court obtained a written report from three experts. The report concluded that under current conditions approximately 70% of Yahoo! users operating from computer sites in France could be identified. The report specifically noted that Yahoo! already used such identification of French users to display advertising banners in French. The 70% number applied irrespective of whether a Yahoo! user sought access to an auction

site, or to a site denying the existence of the Holocaust or constituting an apology for Nazism.

With respect to auction sites, the report concluded that it would be possible to identify additional users. Two out of the three experts concluded that approximately an additional 20% of users seeking access to auction sites offering Nazi-related items for sale could be identified through an honor system in which the user would be asked to state his or her nationality. In all, the two experts estimated that almost 90% of such auction site users in France could be identified: "The combination of the two procedures, namely geographical identification of the IP address and declaration of nationality, would be likely to achieve a filtering success rate approaching 90%." The third expert expressed doubts about the number of additional users of the auction site who would respond truthfully under the honor system. He did not, however, specify an alternative number of users — say, 15% or 10% — who would respond truthfully.

With respect to sites denying the existence of the Holocaust or constituting an apology for Nazism, the report was not able to "propose suitable and effective technical solutions" because no "grievance" against those sites had been made with "sufficient precision." In consequence, as to these non-auction sites, the report did not estimate how many Yahoo! users above the base 70% number could be identified by an honor system.

In a second interim order, issued on November 20, 2000, the French court reaffirmed its May 22 order and directed Yahoo! to comply within three months, "subject to a penalty of 100,000 Francs per day of delay effective from the first day following expiry of the 3 month period." (The May 22 order had specified a penalty of 100,000 Euros rather than 100,000 Francs.) The court "reserve[d] the possible liquidation of the penalty" against Yahoo!. The French court's November 20 order required Yahoo! France (as distinct from Yahoo!) to

display "a warning to surfers even before they have made use of the link to Yahoo.com, to be brought into effect within 2 months following notification of the present order." However, the French court found "that YAHOO FRANCE has complied *in large measure* with the spirit and letter of the order of 22nd May 2000[.]" (Emphasis added.)

The November 20 order required Yahoo! to pay 10,000 Francs for a report, to be prepared in the future by one of the experts previously appointed by the court, to determine whether Yahoo! was in compliance with the court's orders. It also awarded a total of 20,000 Francs against Yahoo! for expenses under Article 700, payable to LICRA and UEJF, and an unspecified amount of costs against Yahoo!, payable to LICRA and UEJF. The court specifically stated that it was not awarding any expenses or costs against Yahoo! France (which it had found to have complied "in large measure" with its order). LICRA and UEJF used United States Marshals to serve both orders on Yahoo! in Santa Clara, California.

Yahoo! did not pursue appeals of either interim order.

The French court has not imposed any penalty on Yahoo! for violations of the May 22 or November 20 orders. Nor has either LICRA or UEJF returned to the French court to seek the imposition of a penalty. Both organizations affirmatively represent to us that they have no intention of doing so if Yahoo! maintains its current level of compliance. Yet neither organization is willing to ask the French court to vacate its orders. As LICRA and UEJF's counsel made clear at oral argument, "My clients will not give up the right to go to France and enforce the French judgment against Yahoo! in France if they revert to their old ways and violate French law."

The record reveals that the French "public prosecutor" participated in the proceedings against Yahoo! and Yahoo! France in the French court, but it does not reveal whether he

has the authority to seek a penalty against Yahoo! under the interim orders, either on his own or pursuant to a request by LICRA and/or UEJF. The public prosecutor was not made a party to the suit in the district court, and has made no appearance in the district court or on appeal to this court. If LICRA, UEJF, or the public prosecutor were to seek the imposition of a penalty by the French court pursuant to the interim orders, that court would have to determine the extent of Yahoo!'s violation, if any, of the orders, as well as the amount of any penalty, before an award of a penalty could be entered.

On December 21, 2000, Yahoo! filed suit against LICRA and UEJF in federal district court, seeking a declaratory judgment that the interim orders of the French court are not recognizable or enforceable in the United States. Subject matter jurisdiction is based solely on diversity of citizenship. 28 U.S.C. § 1332(a)(2). In a thoughtful opinion, the district court concluded that it had personal jurisdiction over LICRA and UEJF. *Yahoo! Inc. v. La Ligue Contre le Racisme et l'Antisemitisme*, 145 F. Supp. 2d 1168, 1180 (N.D. Cal. 2001). Several months later, in another thoughtful opinion, the district court concluded that the suit was ripe, that abstention was not warranted, and that "the First Amendment precludes enforcement within the United States." *Yahoo!, Inc. v. La Ligue Contre le Racisme et l'Antisemitisme*, 169 F. Supp. 2d 1181, 1194 (N.D. Cal. 2001).

In early 2001, after both interim orders had been entered by the French court, and after Yahoo! had filed suit in federal district court, Yahoo! adopted a new policy prohibiting use of auctions or classified advertisements on Yahoo.com "to offer or trade in items that are associated with or could be used to promote or glorify groups that are known principally for hateful and violent positions directed at others based on race or similar factors." Yahoo! has represented, in this court and elsewhere, that its new policy has not been adopted in response to the French court's orders, but rather for independent reasons. Yahoo's new policy eliminates much of the con-

duct prohibited by the French orders. However, after conducting its own Internet research on yahoo.com, the district court found that even after this policy change, Yahoo! "appear[s]" not to have fully complied with the orders with respect to its auction site. 169 F. Supp. 2d at 1185. For example, the district court found that Yahoo! continued to allow the sale of items such as a copy of *Mein Kampf* and stamps and coins from the Nazi period on which the swastika is depicted. *Id.* The district court also found that access was available through yahoo.com to various sites in response to searches such as "Holocaust/5 did not happen." *Id.*

LICRA and UEJF timely appealed the district court's rulings on personal jurisdiction, ripeness, and abstention.

## II.   Personal Jurisdiction

The only bases for personal jurisdiction over LICRA and UEJF in the district court are the actions they have taken in connection with their French suit against Yahoo!. Those actions are sending a cease and desist letter to Yahoo! at its headquarters in Santa Clara, California; serving process on Yahoo! in Santa Clara to commence the French suit; obtaining two interim orders from the French court; and serving the two orders on Yahoo! in Santa Clara.

Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits. *See* Fed. R. Civ. P. 4(k)(1)(A); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same. *Id.* at 1320 (citing Cal. Civ. Proc. Code § 410.10).

**[1]** In *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), the Supreme Court held that a court may exercise per-

sonal jurisdiction over a defendant consistent with due process only if he or she has "certain minimum contacts" with the relevant forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Id.* at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Unless a defendant's contacts with a forum are so substantial, continuous, and systematic that the defendant can be deemed to be "present" in that forum for all purposes, a forum may exercise only "specific" jurisdiction — that is, jurisdiction based on the relationship between the defendant's forum contacts and the plaintiff's claim. The parties agree that only specific jurisdiction is at issue in this case.

**[2]** In this circuit, we analyze specific jurisdiction according to a three-prong test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). The first prong is determinative in this case. We have sometimes referred to it, in shorthand fashion, as the "purposeful availment" prong. *Schwarzenegger*, 374 F.3d at 802. Despite its label, this prong includes both purposeful

availment and purposeful direction. It may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof.

We have typically treated "purposeful availment" somewhat differently in tort and contract cases. In tort cases, we typically inquire whether a defendant "purposefully direct[s] his activities" at the forum state, applying an "effects" test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum. *See Schwarzenegger*, 374 F.3d at 803 (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)). By contrast, in contract cases, we typically inquire whether a defendant "purposefully avails itself of the privilege of conducting activities" or "consummate[s] [a] transaction" in the forum, focusing on activities such as delivering goods or executing a contract. *See Schwarzenegger*, 374 F.3d at 802. However, this case is neither a tort nor a contract case. Rather, it is a case in which Yahoo! argues, based on the First Amendment, that the French court's interim orders are unenforceable by an American court.

**[3]** LICRA and UEJF contend that we must base our analysis on the so-called "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984), which is normally employed in purposeful direction cases. *See, e.g.*, *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1111 (9th Cir. 2004); *Schwarzenegger*, 374 F.3d at 803; *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). In *Calder*, a California-based entertainer sued the *National Enquirer* and various individual defendants for an allegedly defamatory article published in the *Enquirer*. The article had been written and edited in Florida, and the defendants had few contacts with California. The Court nonetheless upheld the exercise of personal jurisdiction in California because the defendants knew that the article would have an effect in that state. In the words of the Court, the defendants had not engaged in "mere untargeted negligence"; rather, their

"intentional, and allegedly tortious, actions were expressly aimed at California." 465 U.S. at 789.

**[4]** In this circuit, we construe *Calder* to impose three requirements: "the defendant allegedly [must] have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food*, 303 F.3d at 1111). In some of our cases, we have employed a slightly different formulation of the third requirement, specifying that the act must have "caused harm, *the brunt of which is suffered* and which the defendant knows is likely to be suffered *in the forum state*." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (emphasis added). The "brunt" of the harm formulation originated in the principal opinion in *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482 (9th Cir. 1993). That opinion required that the "brunt" of the harm be suffered in the forum state; based on that requirement, it concluded that there was no purposeful availment by the defendant. *Id.* at 1486. A dissenting judge would have found purposeful availment. Relying on the Supreme Court's opinion in *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984), he specifically disavowed the "brunt" of the harm formulation. *Core-Vent*, 11 F.3d at 1492 (Wallace, C.J., dissenting) ("[T]he Supreme Court has already rejected the proposition that the brunt of the harm must be suffered in the forum."). Without discussing the disputed "brunt" of the harm formulation, a concurring judge agreed with the dissenter that purposeful availment could be found. *Id.* at 1491 (Fernandez, J., concurring) ("I agree with Chief Judge Wallace that purposeful availment can be found in this case."). Later opinions picked up the "brunt" of the harm formulation of the principal opinion in *Core-Vent* without noting that at least one, and possibly two, of the judges on the panel disagreed with it. *See*, *e.g.*, *Bancroft & Masters*, 223 F.3d at 1087; *Panavision*, 141 F.3d at 1321; *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995).

**[5]** We take this opportunity to clarify our law and to state that the "brunt" of the harm need not be suffered in the forum state. If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state. In so stating we are following *Keeton*, decided the same day as *Calder*, in which the Court sustained the exercise of personal jurisdiction in New Hampshire even though "[i]t is undoubtedly true that the bulk of the harm done to petitioner occurred outside New Hampshire." 465 U.S. at 780.

LICRA and UEJF contend that the *Calder* effects test is not satisfied because, in their view, *Calder* requires that the actions expressly aimed at and causing harm in California be tortious or otherwise wrongful. LICRA and UEJF contend that they have done no more than vindicate their rights under French law, and that their behavior has therefore not been wrongful. They conclude that their behavior therefore does not confer personal jurisdiction in California. We agree with LICRA and UEJF that the *Calder* effects test is appropriately applied to the interim orders of the French court. But we disagree with them about the meaning and application of *Calder*.

In any personal jurisdiction case we must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant. *See, e.g.*, *Quill Corp. v. North Dakota*, 504 U.S. 298, 308 (1992) (upholding jurisdiction to enforce state tax on out-of-state corporation that sent catalogs and goods to forum); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985) (upholding personal jurisdiction based on a course of dealing related to a franchise agreement). Many cases in which the *Calder* effects test is used will indeed involve wrongful conduct by the defendant. *See, e.g.*, *Calder*, 465 U. S. at 790, (allegedly defamatory publication purposefully directed at California); *Bancroft & Masters*, 223 F.3d at 1088 (wrongful interference with California corporation's use of domain name); *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1192

(9th Cir. 1988) (unauthorized use of celebrity's name and likeness to promote Swiss clinic); *Lake*, 817 F.2d at 1422-23 (provision of legal services to secure allegedly improper custody order). But we do not read *Calder* necessarily to require in purposeful direction cases that all (or even any) jurisdictionally relevant effects have been caused by wrongful acts. We do not see how we could do so, for if an allegedly wrongful act were the basis for jurisdiction, a holding on the merits that the act was not wrongful would deprive the court of jurisdiction.

We therefore analyze all of LICRA and UEJF's contacts with California relating to its dispute with Yahoo!, irrespective of whether they involve wrongful actions by LICRA and UEJF. There are three such contacts. The first two contacts, taken by themselves, do not provide a sufficient basis for jurisdiction. However, the third contact, considered in conjunction with the first two, does provide such a basis.

**[6]** The first contact is the cease and desist letter that LICRA sent to Yahoo!, demanding that Yahoo! alter its behavior in California to conform to what LICRA contended were the commands of French law. A cease and desist letter is not in and of itself sufficient to establish personal jurisdiction over the sender of the letter. *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (Fed. Cir. 1998) ("A patentee should not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement."). There are strong policy reasons to encourage cease and desist letters. They are normally used to warn an alleged rights infringer that its conduct, if continued, will be challenged in a legal proceeding, and to facilitate resolution of a dispute without resort to litigation. If the price of sending a cease and desist letter is that the sender thereby subjects itself to jurisdiction in the forum of the alleged rights infringer, the rights holder will be strongly encouraged to file suit in its home forum without attempting first to resolve the dispute informally by

means of a letter. *See Red Wing Shoe*, 148 F.3d at 1360-1361; *Cascade Corp. v. Hiab-Foco AB*, 619 F.2d 36, 38 (9th Cir. 1980); *Douglas Furniture Co. of Cal., Inc. v. Wood Dimensions, Inc.*, 963 F. Supp. 899, 903 (C.D. Cal. 1997) ("If any attempt by an intellectual property holder to put an alleged wrongdoer on notice forced the property holder to submit to the jurisdiction of the alleged wrongdoer's forum, an intellectual property owner would be forced to file an action in his own jurisdiction in order to avoid the threat of being haled before a court in another, possibly distant state.").

This is not to say that a cease and desist letter can never be the basis for personal jurisdiction. For example, in *Bancroft & Masters*, we upheld jurisdiction based on two letters sent by Augusta National Inc. ("ANI"), based in Georgia, contending that Bancroft & Masters, Inc. ("B & M") was improperly using its domain name. One letter was sent to Network Solutions, Inc. ("NSI") in Virginia. NSI was then the sole registrar of domain names. The other, a cease and desist letter, was sent to B & M at its corporate offices in California. B & M sued ANI in federal district court in California seeking a declaratory judgment that it had the right to the disputed domain name. On the assumption that B & M's factual allegation was true, we held that the letters were intended to trigger NSI's dispute resolution procedures, to interfere wrongfully with B & M's use of its domain name, and to misappropriate that name for ANI's own use. 223 F.3d at 1087. We therefore upheld jurisdiction under *Calder* based on the letters.

**[7]** LICRA's letter was not used to facilitate settlement. Although it stated that LICRA would file suit in eight days if Yahoo! had not complied with LICRA's demands, LICRA filed suit five days after the date of the letter. Nonetheless, LICRA's letter to Yahoo! was more like a normal cease and desist letter than the letters at issue in *Bancroft & Masters*, for it was not abusive, tortious or otherwise wrongful. Rather, it simply alerted Yahoo! to its view of French law and stated its intent to file suit in France to enforce that law against Yahoo!.

Under these circumstances, we do not believe that LICRA's letter is a contact that would, if considered alone, justify the exercise of personal jurisdiction.

[8] LICRA and UEJF's second contact (or, more precisely, set of contacts) with California was service of process on Yahoo! in California. LICRA first effected service of process to commence the French suit. LICRA and UEJF later effected service of the French court's two interim orders. We do not regard the service of documents in connection with a suit brought in a foreign court as contacts that by themselves justify the exercise of personal jurisdiction over a foreign litigant in a United States court. If we were to hold that such service were a sufficient basis for jurisdiction, we would be providing a forum-choice tool by which any United States resident sued in a foreign country and served in the United States could bring suit in the United States, regardless of any other basis for jurisdiction. We are unaware of any case so holding, and Yahoo! has cited none.

[9] Third, and most important, LICRA and UEJF have obtained two interim orders from the French court directing Yahoo! to take actions in California, on threat of a substantial penalty. We agree with LICRA and UEJF that the French court's orders are appropriately analyzed under the *Calder* effects test.

[10] The first two requirements are that LICRA and UEJF "have '(1) committed an intentional act, [which was] (2) expressly aimed at the forum state[.]' " *Schwarzenegger*, 374 F.3d at 805 (quoting *Dole Food*, 303 F.3d at 1111). It is obvious that both requirements are satisfied. LICRA intentionally filed suit in the French court. Indeed, it had previously signaled its intent to file suit in its April 5 letter to Yahoo!. UEJF intentionally joined LICRA's suit ten days later. Further, LICRA and UEJF's suit was expressly aimed at California. The suit sought, and the French court granted, orders directing Yahoo! to perform significant acts in California. It is of

course true that the effect desired by the French court would be felt in France, but that does not change the fact that significant acts were to be performed in California. The servers that support yahoo.com are located in California, and compliance with the French court's orders necessarily would require Yahoo! to make some changes to those servers. Further, to the extent that any financial penalty might be imposed pursuant to the French court's orders, the impact of that penalty would be felt by Yahoo! at its corporate headquarters in California. *See Dole Food*, 303 F.3d at 1113-14.

**[11]** The third requirement is that LICRA and UEJF's acts " 'caus[e] harm that the defendant knows is likely to be suffered in the forum state.' " *Id.* This requirement is somewhat problematic, for Yahoo! has not shown or even alleged any specific way in which it has altered its behavior in response to the French court's interim orders. Yahoo! changed its policy with respect to Yahoo.com after the French court's orders were entered, but Yahoo! has consistently maintained that the change was unrelated to the orders. Therefore, even if we were persuaded that Yahoo!'s change of policy harmed it in some way, Yahoo! itself has represented that such harm was not caused by any action of LICRA or UEJF. Nor is it clear that, absent the interim orders, Yahoo! would change its policy in the future. Indeed, Yahoo! represented to us during oral argument that there is nothing that it would like to do, but is now refraining from doing, because of the interim orders.

Yahoo!, however, points to the possibility that a substantial penalty will be assessed under the French court's November 20 interim order. It points in particular to the provision in that order specifying that the potential amount of the penalty increases by 100,000 Francs for every day that Yahoo! is in violation of the court's orders. Yahoo! represents to us that even now, after its change of policy, it is acting in plain violation of the orders. It contends that a declaratory judgment determining the enforceability by an American court of the French court's orders will allow it to determine an appropriate

course of conduct with respect to the activities in which it continues to engage. The district court found that, notwithstanding its new policy,

> the Yahoo.com auction site still offers certain items for sale (such as stamps, coins, and a copy of *Mein Kampf*) which *appear* to violate the French Order. While Yahoo! has removed the *Protocol of the Elders of Zion* from its auction site, it has not prevented access to numerous other sites which reasonably "may be construed as constituting an apology for Nazism or a contesting of Nazi crimes."

169 F. Supp. 2d at 1185 (emphasis added).

In both this court and the district court, LICRA and UEJF have represented that, in their view, Yahoo! is in what they call "substantial compliance" with the French court's orders. They have further represented that they will not seek enforcement of the penalty provision if Yahoo! continues its present level of compliance with the orders. However, LICRA and UEJF have stopped short of making a binding contractual commitment that they will not enforce the orders, and they have taken no action to have the orders withdrawn. As their counsel made clear at oral argument, LICRA and UEJF want to be able to return to the French court for enforcement if Yahoo! returns to its "old ways." For its part, while Yahoo! does not independently wish to take steps to comply more fully with the French court's orders, it states that it fears that it may be subject to a substantial (and increasing) fine if it does not. Yahoo! maintains that in these circumstances it has a legally cognizable interest in knowing whether the French court's orders are enforceable in this country.

In a specific jurisdiction inquiry, we consider the extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts. A strong showing on one axis will permit a lesser showing on the other.

A single forum state contact can support jurisdiction if "the cause of action . . . arise[s] out of that particular purposeful contact of the defendant with the forum state." *See Lake*, 817 F.2d at 1421. The case before us is the classic polar case for specific jurisdiction described in *International Shoe*, in which there are very few contacts but in which those few contacts are directly related to the suit. *See* 326 U.S. at 318 ("[S]ome single or occasional acts of the corporate agent in a state . . . because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit."). All of the contacts with the forum state in this case are either the interim orders themselves or contacts directly related to those orders.

LICRA and UEJF have not sought enforcement of the French court's orders in this country, and they have stated that they will not seek enforcement or penalties so long as Yahoo! continues its current course of conduct. However, LICRA and UEJF have not sought to vacate the French court's orders, and it is at least possible that they might later seek enforcement based on a continuation of Yahoo!'s current conduct. Or more likely, they might seek enforcement if Yahoo! changes it conduct in the future. But even if LICRA and UEJF seek enforcement at some time in the future, and even if the French court finds a violation that warrants the imposition of a penalty, enforcement of that penalty is extremely unlikely in the United States. Enforcement is unlikely not because of the First Amendment, but rather because of the general principle of comity under which American courts do not enforce monetary fines or penalties awarded by foreign courts.

Finally, Yahoo! contends that it has a legally protected interest, based on the First Amendment, in continuing its current policy with respect to Nazi memorabilia and Holocaust-related anti-semitic materials. Until that contention is endorsed by the judgment of an American court, it is only a contention. But even if the French court's orders are not enforced against Yahoo!, the very existence of those orders

may be thought to cast a shadow on the legality of Yahoo!'s current policy.

**[12]** It is a close question whether LICRA and UEJF are subject to personal jurisdiction in California in this suit. But considering the direct relationship between LICRA and UEJF's contacts with the forum and the substance of the suit brought by Yahoo!, as well as the impact and potential impact of the French court's orders on Yahoo!, we hold that there is personal jurisdiction.

### III. Ripeness

Because we conclude that the exercise of personal jurisdiction over LICRA and UEJF is proper, we turn to the question of ripeness. Ripeness doctrine is " 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.' " *Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). Even where jurisdiction is present in the Article III sense, courts are obliged to dismiss a case when considerations of prudential ripeness are not satisfied. *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588 (1972) ("Problems of prematurity and abstractness may well present 'insuperable obstacles' to the exercise of the Court's jurisdiction, even though that jurisdiction is technically present.") (citing *Rescue Army v. Municipal Court*, 331 U.S. 549, 574 (1947)).

The existence of Article III subject matter jurisdiction is, like personal jurisdiction, a close question, but we agree with the district court that the effect of the French court's orders on Yahoo! is sufficient to create a case or controversy within the meaning of Article III. *See* 169 F. Supp. 2d at 1187-91. However, we disagree with the district court's conclusion that there is prudential ripeness. In its current form, this case presents the sort of "[p]roblems of prematurity and abstractness" that counsel against reaching the First Amendment question

that Yahoo! insists is presented by this case. *See Socialist Labor Party*, 406 U.S. at 588.

In determining whether a case satisfies prudential requirements for ripeness, we consider two factors: "the fitness of the issues for judicial decision," and "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (quoting *Abbott Labs.*). We address these two factors in turn.

A.    Fitness of the Issue for Judicial Decision

1.    The Substantive Legal Question at Issue

**[13]** Whether a dispute is sufficiently ripe to be fit for judicial decision depends not only on the state of the factual record. It depends also on the substantive legal question to be decided. If the legal question is straightforward, relatively little factual development may be necessary. As we wrote in *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996), "[P]ure legal questions that require little factual development are more likely to be ripe." By contrast, if the legal question depends on numerous factors for its resolution, extensive factual development may be necessary.

A noted example is *Adler v. Bd. of Educ.*, 342 U.S. 485 (1952), in which Justice Frankfurter disagreed with the other justices about the precise legal question presented, and, as a consequence, disagreed about ripeness. Because the legal question, as Justice Frankfurter understood it, required fine-grained and subtle judgments based on extensive factual development, he concluded that the suit was not ripe. *Id.* at 506-07 (Frankfurter, J., dissenting). In the view of the other justices, however, the legal question was different. In their view, this different legal question was relatively simple, requiring little factual development. For them (and for this

different legal question), the suit was ripe. *Id.* at 492-93 (maj. op.); 508-09 (Douglas, J., dissenting). *See* Fritz W. Scharpf, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L.J. 517, 532 (1966). *See also United Public Workers v. Mitchell*, 330 U.S. 75, 90-91 (1947) (dismissing suit as unripe); *id.* at 109 (Black, J., dissenting); *id.* at 116-17 (Douglas, J., dissenting).

**[14]** It is thus important to a ripeness analysis that we specify the precise legal question to be answered. Depending on the legal question, the case may be ripe or unripe. If we ask the wrong legal question, we risk getting the wrong answer to the ripeness question. The legal question presented by this case is whether the two interim orders of the French court are enforceable in this country. These orders, by their explicit terms, require only that Yahoo! restrict access by Internet users located in France. The orders say nothing whatsoever about restricting access by Internet users in the United States. We are asked to decide whether enforcement of these interim orders would be "repugnant" to California public policy.

**[15]** There is currently no federal statute governing recognition of foreign judgments in the federal courts. *See* American Law Institute, *Recognition and Enforcement of Foreign Judgments: Analysis and Proposed Federal Statute* (April 11, 2005) (proposed final draft). The federal full faith and credit statute, 28 U.S.C. § 1738, governs only judgments rendered by courts of states within the United States. In diversity cases, enforceability of judgments of courts of other countries is generally governed by the law of the state in which enforcement is sought. *Bank of Montreal v. Kough*, 612 F.2d 467, 469-70 (9th Cir. 1980); *see also Southwest Livestock & Trucking Co. v. Ramon*, 169 F.3d 317, 320 (5th Cir. 1999); *Choi v. Kim*, 50 F.3d 244, 248 (3d Cir. 1995); *S.A. Andes v. Versant Corp.*, 878 F.2d 147, 150 (4th Cir. 1989); *Ingersoll Milling Mach. Co. v. Granger*, 833 F.2d 680, 686 (7th Cir. 1987); *Branca v. Security Benefit Life Ins. Co.*, 773 F.2d

1158, 1161 (11th Cir. 1985). This is a diversity suit, brought by Yahoo! in federal district court in California.

In a typical enforcement case, the party in whose favor the foreign judgment was granted comes to an American court affirmatively seeking enforcement. The standard rule in such a case is that the federal court sitting in diversity applies the law of the state in which it sits. However, this is not the typical case, for the successful plaintiffs in the French court do not seek enforcement. Rather, Yahoo!, the unsuccessful defendant in France, seeks a declaratory judgment that the French court's interim orders are unenforceable anywhere in this country.

**[16]** Insofar as the issue is whether the French court's orders are enforceable in California, it is clear that California law governs. However, it is less clear whose law governs when enforceability in other states is at issue. This is a potentially difficult choice-of-law question, but we do not need to answer it in order to decide ripeness. First, the central issue is enforceability in California. Therefore, if the suit is unripe under California law, we should not decide the case, irrespective of whether it might be ripe under the law of some other state. To do otherwise would be to allow the tail to wag the dog. Second, in any event, the law of virtually all other states appears to be similar, or even identical, to California law. We may thus safely proceed with our ripeness analysis based on the California law of enforceability.

California, along with many other states, has adopted the Uniform Foreign Money-Judgments Recognition Act ("Uniform Act" or "Act"). Cal. Civ. Proc. Code §§ 1713-1713.8. The relevant standard for enforceability under the Act is whether "the cause of action or defense on which the judgment is based is *repugnant to the public policy* of this state." *Id.* § 1713.4(b)(3) (emphasis added). However, the Act is not directly applicable to this case, for it does not authorize enforcement of injunctions. *See id.* § 1713.1(2) (" 'Foreign

judgment' means any judgment of a foreign state granting or denying recovery of a sum of money, other than . . . a fine or other penalty[.]") But neither does the Uniform Act prevent enforcement of injunctions, for its savings clause specifies that the Act does not foreclose enforcement of foreign judgments "in situations not covered by [the Act]." *Id.* § 1713.7.

Because the Uniform Act does not cover injunctions, we look to general principles of comity followed by the California courts. We may appropriately consult the Restatement (Third) of the Foreign Relations Law of the United States ("Third Restatement" or "Restatement"), given that California courts frequently cite the Restatement, as well as earlier Restatements, as sources of law. *See*, *e.g.*, *Renoir v. Redstar Corp.*, 123 Cal. App. 4th 1145, 1150 (2004) (Third Restatement); *American Home Assurance Co. v. Société Commerciale Toutélectric*, 104 Cal. App. 4th 406, 424 (2003) (same); *Smith v. Hopland Band of Pomo Indians*, 95 Cal. App. 4th 1, 10 (2002) (same); *Pecaflor Construction, Inc. v. Landes*, 198 Cal. App. 3d 342, 349 (1988) (Second Restatement). The general principle of enforceability under the Third Restatement is the same as under California's Uniform Act. That is, an American court will not enforce a judgment if "the cause of action on which the judgment was based, or the judgment itself, is *repugnant to the public policy* of the United States or of the State where recognition is sought[.]" Restatement § 482(2)(d) (emphasis added); *see also* Restatement (Second) of the Conflict of Laws § 117 cmt. c (1971) ("[E]nforcement will usually be accorded [a] judgment [of a foreign court] except in situations where the original claim is *repugnant to fundamental notions of what is decent and just* in the State where enforcement is sought.") (emphasis added).

There is very little case law in California dealing with enforceability of foreign country injunctions under general principles of comity, but that law is consistent with the repugnancy standard of the Restatement. We have found only one case in which a California court has ruled on the enforceabil-

ity of an injunction granted in another country. In *In re Stephanie M.*, 7 Cal. 4th 295 (1994), a Mexican court had entered a guardianship decree purporting to authorize the named guardian to take immediate custody of a child and to return her to Mexico. The California Supreme Court recognized that an injunction could be enforced by the California courts as a matter of comity, but it declined to order enforcement in this particular case because the Mexican decree conflicted with California public policy. *Id.* at 314.

[17] California courts have also relied on public policy in the analogous context of injunctions entered by other American courts. In *Smith v. Superior Court*, 41 Cal. App. 4th 1014 (1996), plaintiff Smith had been badly injured, and her husband and two children killed, when their General Motors ("GM") vehicle burst into flames after a collision. Smith brought a product liability suit in California against GM. Elwell had been an engineer for GM for many years and had extensive knowledge about the design of GM vehicles. An earlier wrongful termination suit between Elwell and GM in Michigan had been dismissed after the parties stipulated to a permanent injunction forbidding Elwell from testifying in any suit about GM vehicles. Smith sought to call Elwell as an expert witness in her California suit. The California Court of Appeal declined to enforce the Michigan injunction on the ground that it "blatantly and irreconcilably conflicts with our fundamental public policy against the suppression of evidence." *Id.* at 1025; *see also Baker v. General Motors Corp.*, 522 U.S. 222 (1998) (Missouri state court not required by 28 U.S.C. § 1738 to enforce the same Michigan injunction against Elwell when such enforcement would violate Missouri public policy).

The repugnancy standard is also generally followed in states other than California. *See, e.g.*, *Hilkmann v. Hilkmann*, 579 Pa. 563, 575 (2004) (observing that the Restatement's repugnancy standard has been incorporated into Pennsylvania common law); *Alberta Sec. Comm'n v. Ryckman*, 200 Ariz.

540, 549 (2001) (stating that foreign judgments are not enforceable under Arizona common law if they are repugnant to public policy); *Panama Processes, S.A. v. Cities Serv. Co.*, 796 P.2d 276, 283 (Okla. 1990) (declaring that a judgment must not be enforced if repugnant to public policy); *Greschler v. Greschler*, 51 N.Y.2d 368, 377 (1980) ("[T]he public policy exception to the doctrine of comity is usually invoked . . . when the original claim is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.") (internal quotation omitted). Further, federal courts sometimes cite general principles of comity without reference to particular state laws. *See, e.g.*, *Jaffe v. Accredited Sur. & Cas. Co.*, 294 F.3d 584, 593 (4th Cir. 2002) (declaring that a judgment will not be enforced if repugnant to public policy); *In re Schimmelpennick*, 183 F.3d 347, 365 (5th Cir. 1999) (to be enforceable, "foreign laws need not be identical to . . . the laws of the United States; they merely must not be repugnant to our laws and policies"); *Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994) ("General comity concerns include . . . whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just."); *see also Hilton v. Guyot*, 159 U.S. 113 (1895) (discussing principles of comity governing enforcement of foreign judgments).

**[18]** Under the repugnancy standard, American courts sometimes enforce judgments that conflict with American public policy or are based on foreign law that differs substantially from American state or federal law. *See, e.g.*, *In re Hashim*, 213 F.3d 1169, 1172 (9th Cir. 2000) (reversing bankruptcy court's refusal to enforce English court's award of $10 million in costs against debtors whose assets had been frozen by Saddam Hussein); *Milhoux v. Linder*, 902 P.2d 856, 861-62 (Colo. Ct. App. 1995) (affirming recognition of Belgian judgment as a matter of comity, even though it was based on a 30-year Belgian statute of limitations). Inconsistency with American law is not necessarily enough to prevent recogni-

tion and enforcement of a foreign judgment in the United States. The foreign judgment must be, in addition, repugnant to public policy.

## 2.   Fitness of the Question for Judicial Decision

**[19]** With the suit in its current state, it is difficult to know whether enforcement of the French court's interim orders would be repugnant to California public policy. The first difficulty is evident. As indicated by the label "interim," the French court contemplated that it might enter later orders. We cannot know whether it might modify these "interim" orders before any attempt is made to enforce them in the United States.

A second, more important, difficulty is that we do not know whether the French court would hold that Yahoo! is now violating its two interim orders. After the French court entered the orders, Yahoo! voluntarily changed its policy to comply with them, at least to some extent. There is some reason to believe that the French court will not insist on full and literal compliance with its interim orders, and that Yahoo!'s changed policy may amount to sufficient compliance.

In its interim second order, entered on November 20, the French court found that Yahoo! France had "complied *in large measure* with the spirit and letter" of its May 22 order. (Emphasis added.) Based on that level of compliance, the French court was satisfied. It declined to enter any further orders against Yahoo! France. It also declined to award any expenses or costs against Yahoo! France, even though in that same order it awarded expenses and costs against Yahoo!. We thus know from this second order that compliance "in large measure" by Yahoo! is very likely to be satisfactory to the French court, just as compliance "in large measure" by Yahoo! France was satisfactory.

LICRA and UEJF insist that Yahoo! has now, in their words, "substantially complied" with the French court's

orders. We take this to be a statement that, in their view, Yahoo! has complied "in large measure" with the orders. For its part, however, Yahoo! insists that it continues to be in serious violation of the orders. The district court did not hold that Yahoo! is in violation, substantial or otherwise, of the French court's orders. It wrote only that Yahoo! does not "appear" to be in full compliance with the French court's order with respect to its auction site, and that various anti-semitic sites continue to be accessible through yahoo.com. 169 F. Supp. 2d at 1185. There is only one court that can authoritatively tell us whether Yahoo! has now complied "in large measure" with the French court's interim orders. That is, of course, the French court.

To the extent that we are uncertain about whether Yahoo! has complied "in large measure" with the French court's orders, the responsibility for that uncertainty can be laid at Yahoo!'s door. In its November 20 interim order, the French court ordered the appointment of one of the experts who had previously reported on the technical feasibility of restricting access by French users to Yahoo.com. Under the November 20 order, Yahoo! was required to pay the expert, who would be charged "to undertake an assignment to prepare a consultancy report on the conditions of fulfilment of the terms of the aforementioned order." Yahoo! has placed nothing in the record to tell us whether Yahoo! has paid the expert; whether the expert has prepared a report for the French court; and, if a report has been prepared, what it says. There is also nothing in the record to indicate what other steps, if any, Yahoo! has taken to obtain an indication from the French court whether it believes that Yahoo! is in compliance, "in large measure" or otherwise, with the terms of its interim orders. All we know for certain is that Yahoo! abandoned its appeal of the May 22 interim order and declined to appeal the November 20 interim order, and that on December 21, a month and a day after entry of the second interim order, it came home to file suit in the Northern District of California.

**[20]** A third difficulty is related to the second. Because we do not know whether Yahoo! has complied "in large measure" with the French court's orders, we cannot know what effect, if any, compliance with the French court's orders would have on Yahoo!'s protected speech-related activities. We emphasize that the French court's orders require, by their terms, only a limitation on access to anti-semitic materials *by users located in France*. The orders do not by their terms limit access by users outside France in any way. Yahoo! contended in the French court that it was technically too difficult to distinguish between users inside and outside France. As described above, the French court commissioned a report by three experts to determine if Yahoo!'s contention were true. The experts disagreed with Yahoo!, concluding that Yahoo! is readily able to distinguish between most users inside and outside France.

With respect to users seeking access to forbidden auction sites, two out of the three experts concluded that Yahoo! could identify almost 90% of its users located in France. The third expert did not dispute that 70% of such auction site users could be identified, but expressed doubt about how many additional such users could be identified. With respect to users seeking access to sites of Holocaust deniers and Nazi apologists, the experts declined to propose any solution by which a greater number than 70% of users located in France could be identified.

In its briefing to this court, Yahoo! contends that restricting access by French Internet users in a manner sufficient to satisfy the French court would in some unspecified fashion require Yahoo! simultaneously to restrict access by Internet users in the United States. This may or may not be true. It is almost certainly not true if Yahoo! is now complying "in large measure" with the French court's orders, for in that event the French court will almost certainly hold that no further compliance is necessary. Even if the measures Yahoo! has already taken restrict access by American Internet users to anti-

semitic materials, this has no bearing on Yahoo!'s First Amendment argument. By its own admission, Yahoo! has taken these measures entirely of its own volition, for reasons entirely independent of the French court's orders.

However, it is possible, as Yahoo! contends, that it has not complied "in large measure" with the French court orders, and that the French court would require further compliance. It is also possible, as Yahoo! contends, that further compliance might have the necessary consequence of requiring Yahoo! to restrict access by American Internet users. But Yahoo! has been vague in telling us in what ways, and for what reasons, it believes further compliance might have that consequence. One possible reason for Yahoo!'s vagueness might be that its contention is ill-founded, and that a detailed explanation would reveal that fact. We are not now in a position to judge this. Another, more important, reason — not merely a possible reason — for its vagueness is that Yahoo! has no way of knowing what further compliance might be required by the French court. Until it knows what further compliance (if any) the French court will require, Yahoo! simply cannot know what effect (if any) further compliance might have on access by American users.

The possible — but at this point highly speculative — impact of further compliance with the French court's orders on access by American users would be highly relevant to the question whether enforcement of the orders would be repugnant to California public policy. But we cannot get to that question without knowing whether the French court would find that Yahoo! has already complied "in large measure," for only on a finding of current noncompliance would the issue of further compliance, and possible impact on American users, arise.

[21] Without a finding that further compliance with the French court's orders would necessarily result in restrictions on access by users in the United States, the only question in

this case is whether California public policy and the First Amendment require unrestricted access by Internet users *in France*. In other words, the only question would involve a determination whether the First Amendment has extraterritorial application. The extent of First Amendment protection of speech accessible solely by those outside the United States is a difficult and, to some degree, unresolved issue. *Compare, e.g.*, *Desai v. Hersh*, 719 F. Supp. 670, 676 (N.D. Ill. 1989) ("[F]or purposes of suits brought in the United States courts, first amendment protections do not apply to all extraterritorial publications by persons under the protections of the Constitution."), *and Laker Airways Ltd. v. Pan American Airways, Inc.*, 604 F. Supp. 280, 287 (D.D.C. 1984) ("It is less clear, however, whether even American citizens are protected specifically by the First Amendment with respect to their activities abroad[.]"), *with Bullfrog Films, Inc. v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986) ("[T]here can be no question that, in the absence of some overriding governmental interest such as national security, the First Amendment protects communications with foreign audiences to the same extent as communications within our borders."), *aff'd*, 847 F.2d 502 (9th Cir. 1988).

**[22]** We are thus uncertain about whether, or in what form, a First Amendment question might be presented to us. If the French court were to hold that Yahoo!'s voluntary change of policy has already brought it into compliance with its interim orders "in large measure," no First Amendment question would be presented at all. Further, if the French court were to require additional compliance with respect to users in France, but that additional compliance would not require any restriction on access by users in the United States, Yahoo! would only be asserting a right to extraterritorial application of the First Amendment. Finally, if the French court were to require additional compliance with respect to users in France, and that additional compliance would have the necessary consequence of restricting access by users in the United States, Yahoo! would have both a domestic and an extraterritorial First

Amendment argument. The legal analysis of these different questions is different, and the answers are likely to be different as well.

## B.   Hardship to the Parties

We next consider "the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. As discussed above, we believe that Yahoo! has suffered sufficient harm to justify (though not by a wide margin) the exercise of personal jurisdiction over LICRA and UEJF. The threshold requirement for hardship for purposes of personal jurisdiction, however, is not necessarily the same as the threshold for purposes of prudential ripeness. Particularly where, as here, there are substantial uncertainties bearing on the legal analysis to be performed, there is a high threshold requirement for hardship.

Yahoo! contends that it will suffer real hardship if we do not decide its suit at this time. Yahoo! makes essentially two arguments. First, it argues that the potential monetary penalty under the French court's orders is mounting every day, and that the enforcement of a penalty against it here could be extremely onerous. Second, it argues that the French court's orders substantially limit speech that is protected by the First Amendment. We take these arguments in turn.

## 1.   Enforceability of the Monetary Penalty

Yahoo! contends that the threat of a monetary penalty hangs like the sword of Damocles. However, it is exceedingly unlikely that the sword will ever fall. We may say with some confidence that, for reasons entirely independent of the First Amendment, the French court's orders are not likely to result in the enforcement of a monetary penalty in the United States. The French court's orders threaten monetary sanctions against Yahoo!, which that court explicitly labels "penalties." In order to obtain an award of a penalty from the French court, LICRA

and UEJF would have to return to the French court, to explain to the French court why they believe Yahoo! has violated its interim orders, and to persuade the French court that Yahoo!'s violation merits the imposition of a penalty. In the nearly five years since the entry of the French court's second interim order and Yahoo!'s change of policy, LICRA and UEJF have taken none of these steps. Further, LICRA and UEJF have represented that they have no intention of seeking a monetary penalty by the French court so long as Yahoo! does not revert to its "old ways."

**[23]** More important, even if the French court were to impose a monetary penalty against Yahoo!, it is exceedingly unlikely that any court in California — or indeed elsewhere in the United States — would enforce it. California's Uniform Act does not authorize enforcement of "fines or other penalties." Cal. Civ. Proc. Code § 1713.1(2). The Act includes a savings clause, *see* Cal. Civ. Proc. Code § 1713.7, but the fine is equally unenforceable under California common law doctrine.

California courts follow the generally-observed rule that, " '[u]nless required to do so by treaty, no state [*i.e.*, country] enforces the penal judgments of other states [*i.e.*, countries].' " *In re Manuel P.*, 215 Cal. App. 3d 48, 81 (1989) (Wiener, J., dissenting) (quoting Restatement § 483 cmt. 3); *see also In re Marriage of Gray*, 204 Cal. App. 3d 1239, 1253 (1988). This is consistent with the Restatement's declaration that "[c]ourts in the United States are not required . . . to enforce judgments [from foreign countries] for the collection of . . . fines[ ] or other penalties." Restatement § 483; *see also* 30 Am. Jur. 2d *Execution and Enforcement of Judgments* § 846 (2004) ("Courts in the United States will not recognize or enforce a penal judgment rendered in another nation."). A number of states have adopted an identical version of California's Uniform Act, *see Enforcing Foreign Judgments in the United States and United States Judgments Abroad* 28-32 (Ronald A. Brand ed., 1992), and the common law rule

against the enforcement of penal judgments is venerable and widely-recognized. *See Huntington v. Attrill*, 146 U.S. 657, 673-74 (1892); *see also* 18 James Wm. Moore et al., *Moore's Federal Practice* § 130.05 (2002).

Penal judgments are those intended " 'to punish an offense against the public justice of the [foreign] state[.]' " *Chavarria v. Superior Court*, 40 Cal. App. 3d 1073, 1077 (1974) (quoting *Huntington*, 146 U.S. at 673-74). The test to determine a judgment's nature

> is not by what name the statute [on which the judgment is based] is called by the legislature or the courts of the State in which it was passed, but whether it appears to the tribunal which is called upon to enforce it to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person.

*Huntington*, 146 U.S. at 682.

There are a number of indications that the French judgments are penal in nature. First, the word used by the French court ("astreinte") is consistently translated as "penalty" in the record in this case. For example, the May 22 order provides that Yahoo! and Yahoo! France are "subject to a penalty of 100,000 Euros per day of delay and per confirmed violation[.]" The November 20 order provides that Yahoo! is "subject to a penalty of 100,000 Francs per day of delay[.]"

Second, the French court held that Yahoo! was violating Section R645-1 of the French Penal Code, which declares it a "crime" to exhibit or display Nazi emblems, and which prescribes a set of "criminal penalties," including fines. Fr. C. Pén. § R645-1, *translation available at* http://www.lex2k.org/yahoo/art645.pdf. The monetary penalties against Yahoo! do not lose their character as "penalties" simply because they were obtained in a civil action. *See Wisconsin v. Pelican Ins.*

*Co.*, 127 U.S. 265, 299 (1888). Nor do they lose their character because private litigants initiated the action. A civil remedy is penal, as the term is understood in private international law, if it awards a penalty "to a member of the public, suing in the interest of the whole community to redress a public wrong." *Weiss v. Glemp*, 792 F. Supp. 215, 227 (S.D.N.Y. 1992); *see also Loucks v. Standard Oil Co.*, 224 N.Y. 99, 101 (1918) (Cardozo, J.). In short, the label "civil" does not strip a remedy of its penal nature. Thus, for example, an American court is not required to enforce an order of contempt or an award of punitive damages in a civil action. *Cf. Frank v. Reese*, 594 S.W.2d 119, 121 (Tex. Civ. App. 1979) ("Other jurisdictions are reluctant to give full faith and credit to an order for contempt due to its punitive nature[.]"); *Republic of Philippines v. Westinghouse Elec. Corp.*, 821 F. Supp. 292, 295 (D.N.J. 1992) (refusing to enforce Philippine law providing for punitive damages); *see also* Third Restatement § 483 cmt. b ("Some states consider judgments penal for purposes of non-recognition if multiple, punitive, or exemplary damages are awarded, even when no governmental agency is a party.").

Third, the penalties the French court imposed on Yahoo! are primarily designed to deter Yahoo! from creating, in the words of the November 20 order, "a threat to internal public order." The penalties are payable to the government and not designed to compensate the French student groups for losses suffered. *See Farmers & Merchants Trust Co. v. Madeira*, 261 Cal. App. 2d 503, 510 (1968) (suggesting that a judgment is penal if it is designed to punish a defendant "for an offense committed against the public justice" of the jurisdiction). Judgments designed to deter conduct that constitutes a threat to the public order are typically penal in nature. *Cf. Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963).

The French court awarded nominal damages of one Franc to LICRA and UEJF in its first (but not its second) order. Balanced against the far more substantial penalties payable to the

government (up to 100,000 Francs per day under the second order), this award of one Franc cannot render the orders primarily remedial rather than punitive in nature. *See Ducharme v. Hunnewell*, 411 Mass. 711, 714 (1992) (determining that whether a judgment requires enforcement "depends on whether its purpose is remedial in nature, affording a private remedy to an injured person, or penal in nature, punishing an offense against the public justice"). Even the "restitution" the court ordered — the printing of its judgment in publications of UEJF's and LICRA's choosing — benefits the general public and does not specifically compensate the two student groups for a particular injury.

## 2.   First Amendment

**[24]** Yahoo! argues that any restriction on speech and speech-related activities resulting from the French court's orders is a substantial harm under the First Amendment. We are acutely aware that this case implicates the First Amendment, and we are particularly sensitive to the harm that may result from chilling effects on protected speech or expressive conduct. In this case, however, the harm to First Amendment interests — if such harm exists at all — may be nowhere near as great as Yahoo! would have us believe. Yahoo! has taken pains to tell us that its adoption of a new hate speech policy after the entry of the French court's interim orders was motivated by considerations independent of those orders. Further, Yahoo! refuses to point to anything that it is now not doing but would do if permitted by the orders. In other words, Yahoo! itself has told us that there is no First Amendment violation with respect either to its previous (but now abandoned) speech-related activities, or to its future (but not currently engaged in) speech-related activities. Any restraint on such activities is entirely voluntary and self-imposed.

The only potential First Amendment violation comes from the restriction imposed by the interim orders — if indeed they impose any restrictions — on the speech-related activities in

which Yahoo! is now engaged, and which might be restricted if further compliance with the French court's orders is required. For example, Yahoo! continues to allow auctions of copies of *Mein Kampf*, and it maintains that the French court's orders prohibit it from doing so. The French court might find that Yahoo! has not yet complied "in large measure" with its orders, and that Yahoo! is prohibited by its orders from allowing auctions of copies of *Mein Kampf*.

Even if the French court took this step, Yahoo!'s claim to First Amendment protection would be limited. We emphasize that the French court's interim orders do not by their terms require Yahoo! to restrict access by Internet users in the United States. They only require it to restrict access by users located in France. That is, with respect to the *Mein Kampf* example, the French court's orders — even if further compliance is required — would by their terms only prohibit Yahoo! from allowing auctions of copies of *Mein Kampf* to users in France.

The core of Yahoo!'s hardship argument may thus be that it has a First Amendment interest in allowing access by users in France. Yet under French criminal law, Internet service providers are forbidden to permit French users to have access to the materials specified in the French court's orders. French users, for their part, are criminally forbidden to obtain such access. In other words, as to the French users, Yahoo! is necessarily arguing that it has a First Amendment right to violate French criminal law and to facilitate the violation of French criminal law by others. As we indicated above, the extent — indeed the very existence — of such an extraterritorial right under the First Amendment is uncertain.

### 3.   Summary

**[25]** In sum, it is extremely unlikely that any penalty, if assessed, could ever be enforced against Yahoo! in the United States. Further, First Amendment harm may not exist at all,

given the possibility that Yahoo! has now "in large measure" complied with the French court's orders through its voluntary actions, unrelated to the orders. Alternatively, if Yahoo! has not "in large measure" complied with the orders, its violation lies in the fact that it has insufficiently restricted access to anti-semitic materials by Internet users located in France. There is some possibility that in further restricting access to these French users, Yahoo! might have to restrict access by American users. But this possibility is, at this point, highly speculative. This level of harm is not sufficient to overcome the factual uncertainty bearing on the legal question presented and thereby to render this suit ripe.

## C.   The Dissent Addressed to Ripeness

The dissent addressed to the question of ripeness makes two principal contentions. First, it contends that the French court's interim orders are unconstitutional on their face, and that further factual development is therefore not needed. Second, it contends that if any further factual development is necessary, we should remand to the district court for that purpose. We take these contentions in turn.

## 1.   Unconstitutionality of the French Court's Orders

The dissent repeatedly states that the French court's interim orders are facially unconstitutional. It writes, "The French orders on their face . . . violate the First Amendment and are plainly contrary to one of America's, and by extension California's, most cherished public policies." (Dissent at 481.) It later refers to the French court's orders as "foreign court orders that so obviously violate the First Amendment." (*Id.* at 15.) It writes further, "[T]he absence of a discernible line between the permitted and the unpermitted . . . makes the orders facially unconstitutional." (*Id.* at 490.)

The dissent is able to conclude that the French court's interim orders are facially unconstitutional only by ignoring

what they say. The dissent appears to assume that the orders, on their face, require Yahoo! to block access by United States users. It writes, "[T]he question we face in this federal lawsuit is whether our own country's fundamental constitutional guarantee of freedom of speech protects Yahoo! (and, derivatively, at least its users in the United States) against some or all of the restraints the French defendants have deliberately imposed upon it *within the United States*." (*Id.* at 473-74) (emphasis in original). Further, "Yahoo! confront[s] the dilemma of whether or not to stand by its United States constitutional rights or constrain its speech and that of its user[.]" (*Id.* at 480.) "Legions of cases permit First Amendment challenges to governmental actions or decrees that on their face are vague, overbroad and threaten to chill protected speech. Indeed, the sweeping injunction here presents just such a paradigmatic case." (*Id.* at 480.) Still further, "Under the principles articulated today, a foreign party can use a foreign court decree to censor free speech here in the United States[.]" (*Id.* at 483.)

If it were true that the French court's orders by their terms require Yahoo! to block access by users in the United States, this would be a different and much easier case. In that event, we would be inclined to agree with the dissent. *See*, *e.g.*, *Sarl Louis Feraud Int'l v. Viewfinder Inc.*, No. 04 Civ. 9760, 2005 U.S. Dist. LEXIS 22242 (S.D.N.Y. Sept. 29, 2005) (holding unenforceable as contrary to the First Amendment a French damage judgment based on photographs posted on the Internet freely accessible to American viewers). But this is not the case. The French court's orders, by their terms, require only that Yahoo! restrict access by users in France. The boundary line between what is permitted and not permitted is somewhat uncertain for users in France. But there is no uncertainty about whether the orders apply to access by users in the United States. They do not. They say nothing whatsoever about restricting access by users in the United States.

The dissent's conclusion that the French court's orders are unconstitutional may be based in part on an assumption that

a necessary consequence of compliance with the French court's orders will be restricted access by users in the United States. But if this is the basis for the dissent's conclusion, it could hardly say that the orders are unconstitutional "on their face." Whether restricted access by users in the United States is a necessary consequence of the French court's orders is a factual question that we cannot answer on the current record.

If the only consequence of compliance with the French court's orders is to restrict access by Internet users in France, Yahoo!'s only argument is that the First Amendment has extraterritorial effect. The dissent fails to acknowledge that this is inescapably a central part of Yahoo!'s argument, let alone acknowledge that it may be Yahoo!'s *only* argument.

### 2.   Remand to the District Court

As a fallback position, the dissent contends that we should remand to the district court for a determination whether a necessary consequence of compliance with the French court's orders would be restriction on access by users in the United States. This fallback contention is, of course, in tension with the dissent's conclusion that the French court's orders are unconstitutional on their face.

If a necessary consequence of compliance with the French court's orders were a restriction on access by American users, this would be a different and much easier case. The dissent argues that we should remand to the district court to determine whether this is a necessary consequence. But we cannot obtain this determination merely by remanding to the district court. Before the district court can engage in useful factfinding, it must know whether (or to what extent) Yahoo! has already sufficiently complied with the French court's interim orders. There are two alternative scenarios.

First, if the French court were to conclude, as LICRA and UEJF contend, that Yahoo! has already complied "in large

measure" with the French court's orders, Yahoo! simply has no First Amendment argument. Yahoo! has explicitly stated that its change of policy after the entry of the second interim order was undertaken for reasons entirely independent of the French court's orders. Under this scenario, the question of compliance would disappear, and the district court would have no factfinding role.

Second, if the French court were to determine, contrary to LICRA and UEJF's contention, that Yahoo! has not complied "in large measure," the question of the necessary consequences for American users would then arise. If and when the French court determines what further compliance is necessary, there might be some appropriate factfinding role for the district court on that question. But even under this scenario, we first need to get a determination from the French court as to what further compliance is necessary, for the district court's factfinding role is dependent on there having been such a prior determination by the French court.

Under either scenario, the essential initial step is to find out from the French court whether Yahoo! has complied "in large measure" with its orders, and, if not, what further compliance is required. Until we know that, the district court cannot perform any useful factfinding on the question of whether a necessary consequence of compliance with the French court's orders will be to restrict access by Internet users in the United States.

### Conclusion

First Amendment issues arising out of international Internet use are new, important and difficult. We should not rush to decide such issues based on an inadequate, incomplete or unclear record. We should proceed carefully, with awareness of the limitations of our judicial competence, in this undeveloped area of the law. Precisely because of the novelty, importance and difficulty of the First Amendment issues Yahoo!

seeks to litigate, we should scrupulously observe the prudential limitations on the exercise of our power.

Yahoo! wants a decision providing broad First Amendment protection for speech and speech-related activities on the Internet that might violate the laws or offend the sensibilities of other countries. As currently framed, however, Yahoo!'s suit comes perilously close to a request for a forbidden advisory opinion. There was a live dispute when Yahoo! first filed suit in federal district court, but Yahoo! soon thereafter voluntarily changed its policy to comply, at least in part, with the commands of the French court's interim orders. This change in policy may or may not have mooted Yahoo!'s federal suit, but it has at least come close. Unless and until Yahoo! changes its policy again, and thereby more clearly violates the French court's orders, it is unclear how much is now actually in dispute.

It is possible that because of Yahoo!'s voluntary change of policy it has now complied "in large measure" with the French court's orders. It is also possible that Yahoo! has not yet complied "in large measure." If further compliance is required, Yahoo! will have to impose further restrictions on access by French users. The necessary consequence of such further restrictions on French users may or may not be that Yahoo! will have to impose restrictions on access by American users. Until we know whether further restrictions on access by French, and possibly American, users are required, we cannot decide whether or to what degree the First Amendment might be violated by enforcement of the French court's orders, and whether such enforcement would be repugnant to California public policy. We do not know whether further restrictions are required, and what they might be, because Yahoo! has chosen not to ask the French court. Instead, it has chosen to come home to ask for a declaratory judgment that the French court's orders — whatever they may or may not require, and whatever First Amendment questions they may or may not present — are unenforceable in the United States.

An eight-judge majority of the en banc panel holds, as explained in Part II of this opinion, that the district court properly exercised specific personal jurisdiction over defendants LICRA and UEJF under the criteria of *Calder*. A three-judge plurality of the panel concludes, as explained in Part III of this opinion, that the suit is unripe for decision under the criteria of *Abbott Laboratories*. When the votes of the three judges who conclude that the suit is unripe are combined with the votes of the three dissenting judges who conclude that there is no personal jurisdiction over LICRA and UEJF, there are six votes to dismiss Yahoo!'s suit.

**[26]** We therefore REVERSE and REMAND to the district court with instructions to dismiss without prejudice.

---

FERGUSON, Circuit Judge, with whom O'SCANNLAIN and TASHIMA, Circuit Judges, join with respect to Part I, concurring in the judgment:

I concur that the District Court judgment in favor of Yahoo! should be reversed and the case dismissed, but I do so based on reasons other than those set forth by the majority. I do not believe that lack of ripeness is the proper ground to dismiss Yahoo!'s suit. Instead, I believe that the District Court did not properly exercise personal jurisdiction over the defendants and also should have abstained from deciding Yahoo!'s claims. Yahoo!'s suit should be dismissed, therefore, either under Rule 12(b)(2) or Rule 12(b)(6) of the Federal Rules of Civil Procedure.

I.

The District Court did not properly exercise personal jurisdiction over La Ligue Contre Le Racisme et L'Antisemitisme ("LICRA") and L'Union des Etudiants Juifs de France ("UEJF"). LICRA and UEJF's suit was not "expressly aimed"

at California under the "effects" test of *Calder v. Jones*, 465 U.S. 783, 789-90 (1984), which, I agree with Judge Fletcher, governs this case and may be appropriately applied to the French court orders.

An intentional act aimed exclusively at a location other than the forum state, which results in harm to a plaintiff in the forum state, does not satisfy the "express aiming" requirement under *Calder*. In *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 799 (9th Cir. 2004), an Ohio car dealer ran an advertisement in the *Akron Beacon Journal* that featured Arnold Schwarzenegger as "the terminator" without first seeking Schwarzenegger's permission. We held that the advertisement, though it wrongfully depicted Schwarzenegger, a California resident, "was expressly aimed at Ohio rather than California." *Id.* at 807. Because the dealer's "express aim was local," the district court lacked jurisdiction to hear Schwarzenegger's complaint. *Id. Cf. Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1112 (9th Cir. 2002) (finding that European defendants "expressly aimed" at California, the forum state, since they "communicated directly with Dole's California managers to [fraudulently] induce them . . . to enter into significant and detrimental contractual arrangements"); *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000) (deciding that defendant's "letter was expressly aimed at California[,]" the forum state, "because it individually targeted [Bancroft & Masters], a California corporation doing business almost exclusively in California").

The majority provides a one-sentence explanation for why LICRA and UEJF's suit was expressly aimed at California: "The suit sought, and the French court granted, orders directing Yahoo! to perform significant acts in California." Maj. op. at 425.

That is not true. LICRA and UEJF's suit sought French court orders directing Yahoo! to perform significant acts

locally *in France*, not in California. The May 22, 2000 interim order declares: "[B]y permitting [anti-Semitic] objects to be viewed *in France* and allowing surfers located *in France* to participate in such a display of items for sale, the Company Yahoo! Inc. is therefore committing a wrong *in the territory of France*, a wrong whose unintentional character is averred but which has caused damage to be suffered by LICRA and UEJF, both of whom are dedicated to combating all forms of promotion of Nazism *in France*." (emphases added).

To comply with French law, Yahoo! would need "to prevent surfers calling *from France* from viewing these [anti-Semitic] services on their computer screen"; "to identify the geographical origin of a visiting site from the caller's IP address, which should enable it to prevent surfers calling *from France* . . . from accessing services and sites which[,] when displayed on a screen installed *in France*[,] . . . is liable to be deemed an offence *in France* and/or to constitute a manifestly unlawful trouble [under French law]"; and "to take all measures to dissuade and make impossible any access by a surfer calling *from France* to disputed sites and services of which the title and/or content constitutes a threat to *internal* public order." (emphases added).

There is no evidence whatsoever that LICRA and UEJF had any intention to expressly aim their suit at California. The majority believes that because the effect of the French court orders was for Yahoo! to perform significant acts in California, express aiming on the part of LICRA and UEJF was "obvious." Maj. op. at 425. But the majority fails to recognize what *Schwarzenegger* makes clear: express aiming requires intentional conduct by a party directed at the forum state. LICRA and UEJF are two anti-racist French civil liberties organizations. Yahoo! is a global Internet service. At the time LICRA and UEJF brought their suit, they could not precisely have known of Yahoo!'s server locations, security capabilities, or technical procedures or, more important, how they relate to Yahoo!'s California-based operations. LICRA and

UEJF had one aim and one aim only: to prevent French citizens from using "Yahoo.fr" and "Yahoo.com" to access illegal anti-Semitic hate merchandise in France. They were plainly concerned with Yahoo!'s actions *within France*, regardless of where those actions emanated from.

"It may be true that [LICRA and UEJF]'s intentional [suit] eventually caused harm to [Yahoo!] in California, and [LICRA and UEJF] may have known that [Yahoo!] [was based] in California. But this does not confer jurisdiction, for [LICRA and UEJF]'s express aim was local." *Schwarzenegger*, 374 F.3d at 807.

## II.

The District Court should have also abstained from deciding Yahoo!'s claims.

The common law act of state doctrine specifies:

> Every foreign state is bound to respect the independence of every other sovereign state, and the court of one country will not sit in judgment on the acts of government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). "Judicial . . . engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964). The act of state doctrine therefore "mandates [judicial] abstention." *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989); *see also West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 827 (9th Cir. 1987) ("The act of state doctrine is a combination justiciability and abstention rule . . .").

While a foreign court judgment arising out of private litigation is generally not an act of state, it can be when it gives effect to the public interest of the foreign government. *See Philippine Nat'l Bank v. U.S. Dist. Ct. of Hawaii*, 397 F.3d 768, 773 (9th Cir. 2005); *Liu*, 892 F.2d at 1433-34 & n.2 (citing Restatement (Second) of Foreign Relations of the United States § 41 cmt. d (1965) ("A judgement of a court may be an act of state")).

In *Philippine Nat'l Bank*, a dispute arose between a class of plaintiffs and the Republic of Philippines over the right to the assets of Philippine President Ferdinand Marcos's estate. *Id.* at 770. The class obtained a large judgment in a federal district court in Hawaii against the Marcos estate for human rights violations by the Marcos regime. At the same time, the Republic of Philippines brought suit in the Philippines seeking forfeiture of the Marcos estate's assets on the ground that they were stolen by Marcos from the Philippine government and its people. *Id.* at 771. The Philippine Supreme Court agreed with the Republic of Philippines and ordered the assets to be forfeited to the Philippine Government. *Id.* A federal district court in Hawaii, however, ruled that the Philippine Supreme Court judgment violated the due process rights of the class of plaintiffs and was entitled to no judicial deference. *Id.* at 772.

We disagreed and held that the Philippine Supreme Court judgment was an act of state because it effectuated the "statutory mandate [of the Philippine government] to recover property allegedly stolen from the treasury." *Id.* at 773 (quoting *In re Estate of Ferdinand Marcos Human Rights Litig.*, 94 F.3d 539, 546 (9th Cir. 1996)). Significantly, we held that the "collection efforts of the Republic [of Philippines]," even though they extended beyond Philippine's borders into Singapore, were "governmental," and the Philippine Supreme Court decision upholding those efforts was therefore an act of state. *Philippine Nat'l Bank*, 397 F.3d at 773 ("[T]he Republic's 'interest in the enforcement of its law does not end at its bor-

ders' . . ." ) (quoting *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1121-25 (5th Cir. 1985)).

Like the Philippine forfeiture judgment, both French court orders at issue in this case constitute acts of state. Three factors lead to this conclusion. First, while LICRA and UEJF were private French litigants, they were acting as non-governmental, anti-racist associations and institutional partners with the French government in fighting anti-Semitism.[1] Their injunctive actions against Yahoo! clearly followed the French government's mandate to enforce Le Nouveau Code Penal Art. R. 645-2 ("Nazi Symbols Act"), a criminal provision. The record makes clear, for example, that LICRA and UEJF litigated with the assistance of Mr. Pierre Dillange, First Deputy Prosecutor representing the office of the Public Prosecutor to the County Court of Paris. Dillange, in fact, "demand[ed]" to the French court "that the reality of the damages suffered by [LICRA and UEJF] be recognised." Prior to the issuance of the French court orders, Dillange publicly condemned the sale of Nazi memorabilia on Yahoo.fr and Yahoo.com calling for "constraints and an injunction" against Yahoo!.[2] LICRA and UEJF litigated their claims in accordance with the demands of the French public prosecutor.

Second, French justice Jean-Jacques Gomez expressly recognized in his court orders the compelling interest of France to rid its country of anti-Semitic merchandise and speech within its borders. In his May 22, 2000 interim order, for example, he called Yahoo.com "the largest vehicle in exis-

---

[1] The French anti-racism Pleven law ("Loi Pléven"), passed in July 1972, expressly permits French anti-racist associations to file legal actions to combat racism. The law confers upon French anti-racist associations official "civil party" status in such matters. The French text of the law is referenced at: *http://www.culture.gouv.fr/culture/infos-pratiques/droit-culture/cinema/pdf/l-290781.pdf; see also* Eric Bleich, RACE POLITICS IN AND FRANCE: IDEAS AND POLICYMAKING SINCE THE 1960s 135-39 (2003).

[2] Reuters, "Paris Prosecutor Condemns Nazi Auctions on Yahoo," May 15, 2000, *available at http://www.icare.to/archivemay2000.html.*

tence for the promotion [of] Nazism" and described the commercial sale of Nazi objects as "an affront to the collective memory of a country profoundly traumatized by the atrocities committed by and in the name of the criminal Nazi regime against its citizens." Access to Nazi memorabilia on Yahoo!'s auction sites "constitute[d] a threat to internal public order" and a "wrong in the territory of France." Like the Philippine Supreme Court, the French court here gave clear effect to the collective efforts of French civil liberties organizations, the French government, and French law enforcement to enforce French criminal provisions against anti-Semitism. Justice Gomez's opinion sets forth the moral judgment of France itself.

Third, the French court orders reflected judicial enforcement of a robust French state policy against racism, xenophobia, and anti-Semitism. France has acceded to the International Convention on the Elimination of all Forms of Racial Discrimination (ICEFRD) (1965) and the International Covenant on Civil and Political Rights (ICCPR) (1966), both of which include provisions against racist speech. *See* ICCPR, Art. 20-2; ICEFRD, Art. 4(a). Since World War II, France has introduced sweeping legislation to combat anti-Semitism. In July 1972 it passed "Loi Pléven," which criminalized a range of racist behavior from racial defamation and provocation to racial hatred and violence, and in July 1990 it passed "Loi Fabius-Gayssot," which criminalized speech that denied the existence of the Holocaust or that celebrated Nazism. The Nazi Symbols Act, which Yahoo! was found guilty of violating, encompassed France's earlier dramatic efforts to criminalize racist speech within its borders.

It is apparent then that the French court orders were not merely private judgments but, in fact, reflected the sentiments of two French civil liberties organizations, the French public prosecutor, and, indeed, France itself. They were acts of state.[3]

---

[3]It is also worth noting that the French court orders were final criminal judgments that Yahoo! elected not to appeal through the French court sys-

The District Judge sitting in San Jose, California did not have the authority to second guess these orders and should have abstained from invalidating them. He should have deferred to the Executive and Congress to assess the foreign consequences of France's broad policy against anti-Semitic hate speech. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir. 1992) ("The [act of state] doctrine reflects the prudential concern that the courts, if they question the validity of foreign acts taken by sovereign states, may be interfering with the conduct of American foreign policy by the Executive and Congress.") (footnote and citations omitted). Our current government, in fact, is already "fully committed to monitoring and combating anti-Semitism throughout the world."[4]

The criminal statutes of most nations do not comport with the U.S. Constitution. That does not give judges in this country the unfettered authority to pass critical judgment on their validity, especially where, as here, the criminal statute embodies the determined will of a foreign sovereign to protect its borders from what it deems as morally reprehensible speech of the worst order.

tem. Instead, Yahoo! brought the present declaratory relief action for a U.S. district court to invalidate the French court orders based on a violation of Yahoo!'s First Amendment right. In so doing, Yahoo! here is essentially no different than a party losing in state court who seeks to vindicate his or her federal rights by challenging the adverse state court judgment in federal district court. The Supreme Court has barred such opportunistic attempts at relitigation under the *Rooker-Feldman* doctrine. *See Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 125 S. Ct. 1517, 1521-22 (2005).

[4] Bureau of Democracy, Human Rights, and Labor, U.S. Dept. of State, REPORT ON GLOBAL ANTI-SEMITISM, 5-6, 13-15 (January 2005) (discussing France's efforts to combat anti-Semitism). On October 16, 2004, President George W. Bush signed into law the Global Anti-Semitism Review Act, Pub. L. No. 108-332, which authorized the 2005 report, the first of its kind.

**Volume 2 of 2**

O'SCANNLAIN, Circuit Judge, with whom FERGUSON and TASHIMA, Circuit Judges, join, concurring only in the judgment:

Our requirement that a defendant have "purposefully availed" himself of the protections and benefits of the forum state, or have "purposefully directed" his activities into the forum state, must be read in light of the Supreme Court's admonition in *Milliken v. Meyer*, 311 U.S. 457 (1940), that the exercise of personal jurisdiction must comport with "traditional notions of fair play and substantial justice." *Id*. at 463. Because I cannot agree that California's exercise of personal jurisdiction over La Ligue Contre Le Racisme et L'Antisemitisme ("LICRA") and L'Union des Etudiants Juifs de France ("UEJF") comports with those basic principles, I respectfully dissent from the majority's opinion while concurring in its conclusion that Yahoo!'s suit must be dismissed. For similar reasons, I concur in Judge Tashima's concurrence and in Part I of Judge Ferguson's concurrence.

I

A State's jurisdiction is defined not by force or influence but by physical territory and its judicial power traditionally extended over only those persons and property within its borders. *See Pennoyer v. Neff*, 95 U.S. 714, 720-22 (1878). The idea of "minimum contacts" developed as a surrogate for actual presence in a State but did not alter the essentially terri-

torial nature of jurisdiction. The question in every personal jurisdiction case, then, is whether an individual's contacts with the forum State are so substantial that they render the extension of sovereign power just, notwithstanding his lack of physical presence there.

A

The personal jurisdiction requirement is not merely a rule of civil procedure; it is a constitutional constraint on the powers of a State, as exercised by its courts, in favor of the due process rights of the individual. *See Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) ("The requirement that a court have personal jurisdiction flows not from [Article] III, but from the Due Process Clause. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty."). Grounded in the Fourteenth Amendment's protection of the processes necessary to ensure basic fairness in the application of the law, the requirement that an individual have "certain minimum contacts" with the relevant forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,' " *International Shoe*, 326 U.S. 310, 316 (1945) (quoting *Milliken*, 311 U.S. at 463), protects him from the unpredictable and burdensome exercise of authority by foreign courts. It follows from this that the rights and interests of Yahoo! and the interests of the State of California, if not irrelevant to the inquiry, are clearly subordinate to the rights of LICRA and UEJF, the parties against whom jurisdiction is asserted and whose rights are protected by the Due Process Clause.

The Supreme Court has advised that

> the constitutional touchstone remains whether the defendant purposefully established "minimum contacts" in the forum State. Although it has been argued that *foreseeability of causing injury in another State should be sufficient to establish such*

> *contacts there when policy considerations so require*, the Court has consistently held that this kind of foreseeability is not a "sufficient benchmark" for exercising personal jurisdiction. Instead, the foreseeability that is critical to due process analysis is that the defendant's conduct *and connection with the forum State are such that he should reasonably anticipate being haled into court there.*

*Burger King v. Rudzewicz*, 471 U.S. 462, 542 (1985) (emphases added). By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (STEVENS, J., concurring in judgment), the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

B

The Supreme Court has never approved such a radical extension of personal jurisdiction as would sanction the majority's holding that, by litigating a bona fide claim in a foreign court and receiving a favorable judgment, a foreign party automatically assents to being haled into court in the other litigant's home forum. Such a result cannot be reconciled with the "constitutional touchstone" of foreseeability: that the defendant "should reasonably anticipate being haled into court" in the forum. *Burger King*, 471 U.S. at 542.

In *Calder v. Jones*, 465 U.S. 783 (1984), the defendants should reasonably have expected that, by circulating a libelous story in California about a California celebrity, they would be haled into court in California to answer for their tortious behavior. And in *Burger King*, because the defendants' business ties with the State of Florida were "shielded by the

'benefits and protections' " of Florida's laws, it was "presumptively not unreasonable to require [them] to submit to the burdens of litigation [there] as well." 471 U.S. at 543. These cases stake out the limits of personal jurisdiction as approved by the Supreme Court.

LICRA's and UEJF's actions lie beyond that limit. Neither party has ever carried on business or any other activity through which they have availed themselves of the benefits and protections of California's laws,[1] nor should either party have reasonably anticipated that it would be haled into court in California to answer for the legitimate exercise of its rights in France.

## II

This case was reheard en banc primarily for the purpose of answering the question of whether the underlying action in a non-contract case must be tortious or otherwise wrongful to justify the exercise of personal jurisdiction, or whether the "express aiming" of any action, regardless of culpability, will suffice.[2] Although the resolution of that question does not affect my conclusion that California cannot exercise personal jurisdiction over LICRA or UEJF, I respectfully disagree with the majority's interpretation of *Calder* on this point.

---

[1] I agree with the majority that the mailing in good faith of cease and desist letters and the use of the United States Marshal's Office to effect service of process of documents related to the French legal proceedings are not sufficient bases for jurisdiction. Maj. op. at 423-25.

[2] Although the fact is ignored by the majority, this question was settled law in our circuit prior this appeal being reheard en banc. In *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000), the panel made it clear that its decision relied on the assumption that the defendant had engaged in *tortious* conduct. Judge Sneed, writing for a majority of the panel, further held that "[j]urisdiction in California would be ripe for challenge if following the development of trial it should appear that ANI acted reasonably and in good faith to protect its trademark against an infringer." *Id.* at 1089 (Sneed, J., concurring).

A

Under the majority's reading of *Calder*, acts giving rise to personal jurisdiction in a non-contract case need not be wrongful. Maj. op. at 423 ("[W]e do not read *Calder* necessarily to require in purposeful direction cases that all (or even any) jurisdictionally relevant effects have been caused by wrongful acts."). That conclusion is undermined by the language of *Calder* itself and requires the majority to divorce that case's holding from its fact—always a dubious exercise. In *Calder*, the Supreme Court affirmed a decision that had "concluded that a valid basis for jurisdiction existed *on the theory that petitioners intended to, and did, cause tortious injury* to respondent in California." *Calder*, 465 U.S. at 1485 (emphasis added). The Court itself held that "[i]n this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction is proper *on that basis*." *Id.* at 1487 (emphasis added). The wrongfulness of the defendants' acts was, therefore, a key element in the jurisdictional calculus, possibly because a person who has committed a wrongful act should expect to be haled into court by his victim in the victim's home State. Although the Court might have reached the same result if the act in question had not been wrongful—as the majority apparently presumes it would—it is reckless of us to proceed on the basis of such speculation beyond what is currently the farthest reach of personal jurisdiction approved by the Court.

B

The majority's jurisdictional legerdemain is nimble but, like any trick, does not stand up to close scrutiny. It begins innocuously enough by noting that the traditional analysis of minimum contacts depends on whether the disputed act sounds in tort or in contract. In tort cases, "we typically inquire whether a defendant 'purposefully direct[s] his activities' at the forum state," maj. op. at 420. And in commercial and contract cases, "we typically inquire whether a defendant

'purposefully avails itself [sic] of the privilege of conducting activities' or 'consummate[s] [a] transaction' in the forum." *Id.* and do not require that the defendants actions be wrongful. However, that traditional distinction is abruptly jettisoned when the majority next asserts that "*in any personal jurisdiction case* we must evaluate all of a defendant's contacts with the forum state, *whether or not those contacts involve wrongful activity* by the defendant." *Id.* at 422 (emphases added).

The majority's statement is, quite literally, unprecedented. With a stroke of its pen, the majority extends the analysis previously applied only to commercial and contract cases to all assertions of personal jurisdiction. Tellingly, the only cases that the majority musters in support of its novel assertion are commercial or contract-related "purposeful availment" cases. In *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992), the Supreme Court held that when an out-of-state mail order company "purposefully avails itself of the benefits of an economic market in the forum State, it may subject itself to the State's *in personam* jurisdiction even if it has no physical presence in the State." 504 U.S. at 302. And, in *Burger King*, the Court held that jurisdiction was proper on the grounds that defendants' business ties with the State of Florida were "shielded by the 'benefits and protections' " of Florida's laws. 471 U.S. at 543. In sharp contrast, every "purposeful direction" case that the majority cites in its opinion involved tortious or otherwise wrongful acts by the defendants.

Given our long line of precedent applying the "purposeful availment" test only in contract and commercial cases, and the majority's concession that this case should be analyzed under *Calder*'s "purposeful direction" test, *see* maj. op. at 423, the majority's conflation of the elements of these two tests is an unseemly act of judicial slight of hand. LICRA and UEJF are, indisputably, non-commercial actors who have never purposefully availed themselves of the benefits or protections of California's laws. Therefore, neither *Calder* nor any other

Supreme Court precedent justifies California's assertion of personal jurisdiction over them.

## III

LICRA's and UEJF's actions and contacts with the State of California were, at most, incidental to the legitimate exercise of their rights under French law. They should not have reasonably anticipated being haled into court in California to answer for their prosecution of a lawsuit in France. Because California's exercise of personal jurisdiction over them on that basis would violate traditional notions of fair play and substantial justice and, therefore, the procedural guarantees of the Due Process Clause, I would remand the case with instructions to dismiss for want of personal jurisdiction and not reach the issue of ripeness.

Thus, while I must dissent from its rationale, I concur in the majority's conclusion that the district court's opinion must be reversed.

TASHIMA, Circuit Judge, with whom FERGUSON and O'SCANNLAIN, Circuit Judges, join, concurring in the judgment:

I concur in the judgment reversing and remanding with instructions to dismiss this action, but I dissent from the majority's conclusion that personal jurisdiction exists over La Ligue Contre Le Racisme et L'Antisemitisme ("LICRA") and L'Union des Etudiants Juifs de France ("UEJF"). I therefore concur in Part I of Judge Ferguson's concurring opinion — that a district court located in California cannot exercise personal jurisdiction over LICRA and UEJF.

Because I believe that the district court lacked in personam jurisdiction, I would not reach the issues discussed in Part III

of the majority opinion[1] — ripeness — and Part II of Judge Ferguson's concurring opinion — whether, even if it had jurisdiction over the defendants, the district court should have abstained from deciding this case. I do believe, however, that Judge Ferguson's eloquent discussion in Part II of the reasons why he would hold that abstention is proper further supports why personal jurisdiction is lacking in this case.

LICRA and UEJF ("defendants") had only three contacts with California. These contacts were a cease and desist letter, the service of process to commence the French action, and the subsequent service of two interim orders on Yahoo!. Service was made in accordance with the requirements of the Hague Convention on the service abroad of judicial documents. As the majority rightly acknowledges, these contacts are an insufficient basis for the exercise of personal jurisdiction over defendants. Maj. op. at 422-25.

The majority goes on, however, to find a sufficient basis for the exercise of personal jurisdiction over defendants in two interim orders issued by the French court because those orders "direct[ed] Yahoo! to take actions in California, on threat of a substantial penalty." *Id.* at 425. The majority's conclusion is not based on any contact with California, but on acts which it contends were "expressly aimed at the forum state." *Id.* (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 805 (9th Cir. 2004)). But neither *Schwarzenegger* nor any other case relied on by the majority based a finding of specific jurisdiction on conduct expressly aimed at the forum state which conduct was not also a contact with the forum state. Here, for the first time, the majority completely divorces the expressly-aimed conduct from the requirement that that conduct also be a contact with the forum state. Thus, I submit

---

[1] I refer to the opinion authored by Judge W.A. Fletcher as the "majority opinion," because it commands a majority of the en banc court on the issue of personal jurisdiction, although that is not the majority that controls the disposition of the case.

that the finding of personal jurisdiction on the basis of *Calder*'s[2] "effects" test in the circumstances of this case is a radical extension of that doctrine.

It is self-evident that the orders are the orders of the French court, not acts of defendants. Thus, more precisely, the majority's finding of personal jurisdiction is, in fact, based on LICRA and UEJF *petitioning* the French court for relief under French law. But should the petitioning by a citizen of the courts of his or her own country to uphold the laws of that country form the *sole* basis of personal jurisdiction over that citizen by the courts of a foreign country? The majority's answer is yes. That answer, seems to me, to be perverse. First, the bringing and prosecuting of an action in a French court are all acts done wholly in France. None of these acts constitutes a "contact" with California. Second, no citizen of any country can safely sue a foreign defendant under the majority's theory of specific jurisdiction because the sought judgment, including an ordinary money judgment for injury or damages, will have an adverse "effect" on the defendant's purse or treasury in that defendant's home country. In this sense, every lawsuit naming a foreign defendant can be said to be expressly aimed at that defendant's home state (or nation). Thus, unless it is anchored to a contact with the forum, express aiming becomes a meaningless test in terms of due process.

Moreover, courts, even when acting at the behest of a private petitioner, have an independent interest and obligation to uphold their nations' domestic laws, particularly when, as here, those laws are designed to carry out an important and strongly-held national policy. Thus, as Judge Ferguson reminds us, it is the manner in which the French courts have determined to vindicate French national policy — that "state action" — that has the adverse "effect" in California that Yahoo! is complaining about, not the acts of defendants in petitioning for French anti-Semitism laws to be upheld. It was

---

[2]*Calder v. Jones*, 465 U.S. 783, 789-90 (1984).

not defendants who determined the terms and scope of injunctive relief, nor was it defendants who determined that continuing non-compliance should be "subject to a penalty," or the amount of such a penalty. Needless to say, defendants will not be the ones who decide whether such penalties ultimately will have to be paid or waived.[3]

Whatever other conduct *Calder*'s "effects" test was intended to encompass, it surely was not intended to include attribution of the effects of an intervening court's order when a citizen does no more that petition a court in his own country for relief under domestic law, particularly in a case, such as this, in which defendants have had no contact that would "provide a sufficient basis for jurisdiction."[4] Maj. op. at 423. For these additional reasons, I concur in Part I of Judge Ferguson's concurring opinion.

FISHER, Circuit Judge, with whom HAWKINS, PAEZ, CLIFTON and BEA, Circuit Judges, join, concurring in part and dissenting in part:[1]

---

[3]Indeed, if any penalties are ever paid, they will not redound to the benefit of defendants, but "are payable to the government." Maj. op at 444.

[4]What the majority opinion calls a "third contact," maj. op. at 423 ("However, the third contact, considered in conjunction with the first two, does provide such a [sufficient] basis [for personal jurisdiction]."), is not a "contact" with California at all. The majority classifies as the "[t]hird, and most important [contact], LICRA and UEJF have obtained two interim orders from the French court directing Yahoo! to take actions in California, on threat of a substantial penalty." *Id.* at 425. It cites no authority for the proposition that conduct by LICRA and UEJF which takes place entirely in France can be classified as a "contact" with California.

[1]Like Judge Tashima, we refer to Judge Fletcher's opinion as the "majority" or the "majority opinion" because an eight-judge majority of the en banc court joins Part II of the opinion on the issue of personal jurisdiction. As the per curiam and Judge Fletcher's opinions explain, however, Judge Fletcher's articulated rationale on ripeness in Part III of his opinion represents a three-judge plurality and does not command a majority of the en banc court. Nevertheless, we refer to Judge Fletcher's opinion as the "majority" throughout our dissent for ease of reference.

## I.  Overview

Stated simply, the issue before us is whether a United States Internet service provider, whose published content has been restricted by a foreign court injunction, may look to the United States federal courts to determine the enforceability of those restrictions under the United States Constitution's First Amendment. The French injunctive orders — backed by substantial, retroactive monetary penalties for noncompliance — require Yahoo! to block access from French territory to Nazi-related material on its <yahoo.com> website.[2] Some prohibited content is readily identifiable, such as Nazi artifacts or copies of *Mein Kampf*. Much, however, is not. The orders impose the following sweeping mandate:

> We order the Company YAHOO! Inc. to take all necessary measures to dissuade and render impossible *any access* via Yahoo.com to the Nazi artifact auction service and *to any other site or service that may be construed as constituting an apology for Nazism or a contesting of Nazi crimes.*

(Emphasis added.) In traditional First Amendment terms, this injunctive mandate is a prior restraint on what Yahoo! may post (or control access to) on its U.S.-located server — imposed under principles of French law and in such facially vague and overbroad terms that even the majority does not know "whether further restrictions on access by French, and possibly American, users are required" to comply with the French orders. (Op. at 451.) Yahoo! can either hope to comply with what the French court (and the defendants here) deems to be inappropriate content by attempting to block access to material Yahoo! *thinks* the orders cover or by simply

---

[2]As the majority recognizes, any Internet user in France or a French territory — whether or not a French citizen or resident — can gain access to Yahoo!'s U.S.-based server by typing <yahoo.com> into her browser or linking through <fr.yahoo.com>. (Op. at 412.)

removing any questionable content altogether. Or Yahoo! can ignore the French court's mandate in whole or in part and accept the risk of substantial accruing fines. The majority, however, is unmoved. For it, Yahoo!'s proper recourse is to take its case back to France. We cannot agree.

As the district court readily concluded in its thoughtful opinion, "[a] United States court constitutionally could not make such an order." *Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 169 F. Supp. 2d 1181, 1189 (N.D. Cal. 2001) (hereinafter "*Yahoo II*"). It specifically found that the orders are "far too general and imprecise to survive the strict scrutiny required by the First Amendment," and that "[p]hrases such as 'all necessary measures' and 'render impossible' instruct Yahoo! to undertake efforts that will impermissibly chill and perhaps even censor protected speech." *Yahoo II*, 169 F. Supp. 2d at 1189-90 (citing *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987); and *Gooding v. Wilson*, 405 U.S. 518 (1972)). The district court emphasized that " '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Id.* at 1190 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971))).

The issue is not whether the French defendants who obtained the injunctive orders, or the French court that issued them, are justified in trying to suppress hateful speech. We of course recognize the horrors of the Holocaust and the scourge of anti-Semitism, and France's understandable interest in protecting *its* citizens from those who would defend or glorify either. Nor is the issue one of extra-territorial application of the First Amendment; if anything, it is the extra-territorial application of French law to the United States. We do not question the validity of the French orders on French soil, and Yahoo! has complied with the orders as they relate to its <fr.yahoo.com> website. Rather the question we face in this federal lawsuit is whether our own country's fundamental

constitutional guarantee of freedom of speech protects Yahoo! (and, derivatively, at least its users in the United States) against some or all of the restraints the French defendants have deliberately imposed upon it *within the United States*. " '[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.' " *Tory v. Cochran*, 125 S. Ct. 2108, 2111 (2005) (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)).

The majority, after properly opening the door to the federal courthouse by upholding personal jurisdiction, nonetheless turns a blind eye to the constitutional free speech interests of Yahoo!, throwing it out of court because those interests are not "ripe" for adjudication. The majority's thesis rests on the contention that the French "orders do not by their terms limit access by users outside France in any way." (Op. at 438.) But as the majority recognizes elsewhere in its opinion (Op. at 438-441), the crux of this case is not in the words of the order alone, but in their application. And to assess the effects of the orders, one cannot simply disregard the "what" of the orders and focus only on their "who."

As we shall explain later, we disagree with the majority's conclusion that uncertainties about whether Yahoo! can technologically isolate the effects of the orders only to France-based users compel us to withdraw the case from the district court. Even assuming such uncertainties exist and are material, the district court is fully capable of exercising its fact-finding role to resolve them. But there is no uncertainty that the mandate imposed on Yahoo! is also content based, and the orders identify that content in terms that on their face are overbroad and vague. They require Yahoo! to guess what has to be censored on its Internet services here in the United States, under threat of monetary sanction if it guesses wrong. In that respect, the orders are facially unconstitutional.

By their terms, the orders reach "any other site or service [in addition to the auction service] that *may be construed as*

constituting an apology for Nazism or a contesting of Nazi crimes." (Emphasis added.) As the district court rightly understood, this is the crux of Yahoo!'s facial overbreadth and vagueness concern:

> Yahoo! seeks protection for its actions in the United States, specifically the ways in which it configures and operates its auction and Yahoo.com sites. Moreover, the French order requires Yahoo! not only to render it impossible for French citizens to access the proscribed content but also to interpret an *impermissibly overbroad and vague definition of the content* that is proscribed. . . . In light of the Court's conclusion that enforcement of the French order by a United States court would be inconsistent with the First Amendment, *the factual question of whether Yahoo! possesses the technology to comply with the order is immaterial. Even assuming for purposes of the present motion that Yahoo! does possess such technology, compliance still would involve an impermissible restriction on speech.* . . .

*Yahoo II*, 169 F. Supp. 2d at 1193-94 (emphasis added).

Surely the majority is not suggesting that Yahoo! has no First Amendment protection from being sanctioned when it could not guess or it guessed wrong as to what it was supposed to censor on its domestic servers — even if limited to France-based users. (And if not so limited, so much the worse.) Yet the majority faults Yahoo! *because* — like Yahoo! itself — we do not know whether its current activities are permitted by the orders. (Op. at 437.) This is to apply First Amendment precedents exactly backwards. As the majority admits, "[t]he boundary line between what is permitted and not permitted is somewhat uncertain for users in France." (Op. at 448.) Under such circumstances, we blame the law, not the speaker.

Instead, the majority effectively imposes an exhaustion requirement on Yahoo! to litigate this issue in France, confirm that it is still is not in compliance with the orders (just as it was not on May 22 and November 20, 2000) and obtain a "final" adverse judgment before the majority will consider this case ripe. In doing so, the majority imposes a heightened standard on a U.S. plaintiff seeking to vindicate its First Amendment rights when that plaintiff is challenging a *foreign* prior restraint. Principles of ripeness (or comity) do not require this result. The extraordinary hurdles the majority creates are inconsistent with our established jurisprudence protecting this country's tradition of free expression. *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988) (holding that a plaintiff need not have applied and been denied a newspaper rack license before challenging a city ordinance as an unconstitutional prior restraint on speech). To say so is not to deny France's interests in protecting its own citizens from harmful speech, but only to recognize that federal courts have the duty to adjudicate and uphold the legitimate constitutional rights of litigants who have properly invoked our federal jurisdiction.

In correctly sustaining personal jurisdiction over the defendants and in finding an Article III case or controversy, the majority concedes the central dilemma Yahoo! faces as a result of the French injunction. "[W]hile Yahoo! does not independently wish to take steps to comply more fully with the French court's orders, it states that it fears that it may be subject to a substantial (and increasing) fine if it does not." (Op. at 427.) Acknowledging the obvious chilling effect of the injunction, the majority recognizes that "[e]ven if the French court's orders are not enforced against Yahoo!, the very existence of those orders may be thought to cast a shadow on the legality of Yahoo!'s current policy." (Op. at 428-29.)

But unfortunately the majority then stops short, concluding that the "level of harm [suffered by Yahoo!] is not sufficient

to overcome the factual uncertainty bearing on the legal question presented and thereby to render this suit ripe." (Op. at 447.) With respect, the majority creates its own factual dilemma — and bad First Amendment precedent — in its attempt to find daylight between its holdings on personal jurisdiction and ripeness. We agree that the *Calder* "effects" test, *see Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 803 (9th Cir. 2004) (citing *Calder v. Jones*, 465 U.S. 783 (1984)), need not be satisfied by the same degree of harm as ripeness (Op. at 441), but the majority's rationale for finding the harm sufficient in one instance and deficient in the other is seriously flawed.

By peremptorily terminating Yahoo!'s access to federal court, the majority establishes a new and burdensome standard for vindicating First Amendment rights in the Internet context, threatening the Internet's vitality as a medium for robust, open debate. It also bypasses the factfinding role of the district court — failing to credit much of what the district court found on the record as litigated below, and removing the district court from the process of resolving the factual issues the majority now finds so vital to Yahoo!'s First Amendment claims. Accordingly, although we concur in that part of the majority's opinion upholding personal and Article III jurisdiction, we respectfully dissent from its ultimate holding that this case is not ripe for adjudication.

## II.   Prudential Ripeness

The majority invokes prudential ripeness because it finds Yahoo!'s circumstances suffer from "prematurity and abstractness" that preclude our reaching Yahoo!'s claim that the French injunction on its face violates the First Amendment. (Op. at 429-30.) As did the district court, we conclude otherwise.

### A.  *Fitness of the issues for judicial resolution*

### 1.  *A "purely legal" question*

The majority holds this case unfit for judicial resolution by suggesting that it does not involve a "purely legal" question, *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149 (1967), but instead requires us to sort through factual uncertainties, which ultimately make adjudication inappropriate. (Op. at 430.) Yet even if the majority were correct that Yahoo!'s case suffers from a lack of factual development, it does not follow that the suit is therefore rendered unripe. When a dispositive fact is missing from the district court record, we usually remand for further factfinding. We do not peremptorily throw litigants out of court and expect them to petition a foreign court for relief.

To begin with, this case fundamentally involves a straight-forward legal question: whether the French injunction as ordered against Yahoo! runs afoul of the First Amendment. The answer calls for a legal application of free speech doctrine to final orders that on their face are vague and over-broad. True, the defendants must take steps in the French court to initiate actual enforcement, but Yahoo! is subject to the orders and to a retrospective financial penalty for noncompliance. The majority's argument that we should give weight to the label "interim" because it indicates that "the French court contemplated that it might enter later orders" is a make-weight. (Op. at 436.) A court may contemplate issuing subsequent orders whether or not a prior order on the subject is called "interim" or "final." We need not be distracted by the label "interim," because, as the district court found, "there is no dispute that the French order is valid under French law and that the French Court may fix a penalty retroactive to the date of the order." *Yahoo II*, 169 F. Supp. 2d at 1190.

Cases involving far less definitive or targeted mandates — not yet enforced against the complaining party — have been

treated as final actions ripe for adjudication. In *Abbott Laboratories,* one of the majority's lynchpin cases, drug manufacturers challenged the Food and Drug Commissioner's regulation requiring that their products' labels show both a drug's generic and its brand name. The Supreme Court, addressing the "purely legal" issue presented, held that the regulation was a final agency action, even though it was a statement of general applicability and violations of the new rule could be enforced only by the Attorney General authorizing criminal and seizure actions. 387 U.S. at 151-52. The Court held the case ripe for pre-enforcement review because the Commissioner's labeling order placed "petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.* at 152. The Court cited the district court's finding that petitioners either " 'must comply [with the label changeovers] . . . or they must follow their present course and risk prosecution' " and concluded that the latter "course would risk serious criminal and civil penalties for the unlawful distribution of 'misbranded' drugs." *Id.* at 152-53. *See also Frozen Food Express v. United States*, 351 U.S. 40, 43-44 (1956) (holding justiciable a challenge to an Interstate Commerce Commission rule because violations could be punished by criminal sanctions and the rule itself would cause companies to conform their behavior to the regulation); *cf. United States v. Storer Broadcasting Co.*, 351 U.S. 192, 198 (1956) (finding standing to challenge a Federal Communications Commission rule limiting radio licenses even though the broadcaster had not yet received an unfavorable decision).[3]

---

[3]The majority's citation of *Adler v. Bd. of Educ.*, 342 U.S. 485 (1952), as a "noted example" of a debate over ripeness in the context of speech is inapposite. (Op. at 430.) *Adler*, a case affirming limits on the speech of teachers in New York public schools during the post-World War II "Red Scare," not only concerns the constitutionally distinct situation of a state government regulating the speech of its employees (as opposed to a court being asked to enforce a speech-restrictive injunction against a corporation), but also predates important modern free speech precedents establish-

The final, targeted injunction before us presents the same kind of purely legal issue — with Yahoo! confronting the dilemma of whether or not to stand by its United States constitutional rights or constrain its speech and that of its users to avoid a French-imposed penalty. Legions of cases permit First Amendment challenges to governmental actions or decrees that on their face are vague, overbroad and threaten to chill protected speech. Indeed, the sweeping injunction here presents just such a paradigmatic case. *See, e.g.*, *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1434-35 (9th Cir. 1996) (rejecting a ripeness defense to a facial attack on blanket travel restrictions to Cuba under the First and Fifth Amendments, even though the plaintiff group had never applied for a license, because the case presented purely legal questions); *see also Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 129-30 (1992) (addressing a facial First Amendment challenge to a licensing scheme even though the plaintiff had never applied for a permit, citing numerous First Amendment cases involving facial claims); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (concluding that petitioner had established an actual controversy based on his threatened criminal trespass arrest by state police for distributing political handbills and holding that he did not need to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"). Yahoo! seeks nothing more than for a United

ing the doctrine of facial invalidation. *See, e.g.*, *Lakewood*, 486 U.S. at 755-56. Furthermore, Justice Frankfurter was the sole dissenter (and the sole Justice) to question the suit's ripeness; Justices Black and Douglas were convinced the suit was ripe and that New York's laws infringed upon public school teachers' First Amendment rights. *See Adler*, 342 U.S. at 496-511. Because *Adler* itself would certainly be reasoned, and likely decided, differently today given cases such as *Connick v. Myers*, 461 U.S. 138 (1983), and *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), which recognized a government employee's interest in commenting on matters of public concern, *Adler*'s approach to ripeness is hardly illuminating even within the narrow confines of government employee speech.

States court to resolve its legal claim that the French court injunction by its very nature — in whole or in part — threatens Yahoo!'s protected speech. *See NAACP, W. Region v. City of Richmond*, 743 F.2d 1346, 1352, 1358 (9th Cir. 1984) (upholding standing to bring facial challenge to "substantially overbroad" city parade ordinance).

### 2.  *Comity and the repugnance of unconstitutional injunctions*

We do not agree with the majority's professed uncertainties as to whether a California court, under principles of comity, would be inclined to enforce a foreign court order that infringes upon a U.S. corporation's First Amendment rights. The "repugnancy" standard the majority invokes is easily satisfied here. California's case law and its federal underpinnings tell us to honor foreign court judgments unless they "prejudice the rights of United States citizens or violate domestic public policy." *In re Stephanie M.*, 867 P.2d 706, 716 (Cal. 1994) (citing *Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895); and *Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987)). The French orders on their face — and by putting Yahoo! at risk of substantial penalties — violate the First Amendment and are plainly contrary to one of America's, and by extension California's, most cherished public policies.[4] In short, they constitute a foreign judgment that is "repugnant to public policy." (Op. at 436.)

---

[4]As the majority correctly notes, it is California's public policy (rather than U.S. public policy) that is relevant to a comity analysis in a federal diversity case. (Op. at 431.) However, although Yahoo! focused its energies on alleging violations of the federal First Amendment rather than violations of the analogous provision of the California Constitution, *see* art. I, § 2(a), it is certainly not California's public policy to countenance violations of the United States Constitution. Indeed, the California Supreme Court has held California's free speech clause to be more expansive than the First Amendment. *See Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*, 29 P.3d 797, 801 (Cal. 2001) ("Unlike the United States Constitution, which couches the right to free speech as a limit on

The district court considered the role of comity but ultimately found that it was outweighed by U.S. constitutional freedoms. "Although France has the sovereign right to regulate what speech is permissible in France, this Court may not enforce a foreign order that violates the protections of the United States Constitution by chilling protected speech that occurs simultaneously within our borders." *Yahoo II*, 169 F. Supp. 2d at 1192. This finding does not mean that *every* foreign court judgment implicating speech in the United States would be deemed repugnant to American public policy and therefore unenforceable, but *this* particular judgment is so vague and overbroad that it fails the repugnancy analysis. Significantly, the defendants do not argue to us that the French injunction comports with the First Amendment. Indeed, they did not even appeal the district court's ultimate finding that the orders are unconstitutional.

The majority goes to great lengths to avoid labeling a prior restraint on speech — overbroad and vague by its terms — as "repugnant to public policy" and is content to leave in place foreign court orders that so obviously violate the First Amendment. (Op. at 436.) In reaching this result, the majority has succumbed to an error of logic. It has conflated foreign orders that are somewhat inconsistent with U.S. law with those that violate U.S. law. It is one thing for U.S. courts to pass on foreign attorney's fees larger than what domestic laws would award, *see In re Hashim*, 213 F.3d 1169, 1172 (9th Cir. 2000), or to recognize a judgment pursuant to a foreign statute

congressional power, the California Constitution gives '[e]very person' an affirmative right to free speech. Accordingly, we have held that our free speech clause is 'more definitive and inclusive than the First Amendment.' ") (internal citations omitted). *See also Sarl Louis Feraud Int'l v. Viewfinder Inc.*, 2005 U.S. Dist. LEXIS 22242, at *19 (S.D.N.Y. 2005) ("American courts have recognized that foreign judgments that run afoul of *First Amendment* values are inconsistent with *our* notions of what is fair and just, and conflict with the strong public policy of *our* State [New York].") (emphasis in original)."

of limitations longer than that of its domestic analogue, *see Milhoux v. Linder*, 902 P.2d 856, 861-62 (Colo. Ct. App. 1995). It is quite another to imply, as the majority does, that a violation of the U.S. Constitution is no different from any other "[i]nconsistency with American law," which the majority claims "is not necessarily enough to prevent recognition and enforcement of a foreign judgment in the United States." (Op. at 435-36.)

Neither *In re Hashim* nor *Milhoux* implicated federal or state constitutional rights. Indeed, both cases held that the foreign judgments being challenged were not repugnant to the public policy of either Arizona or Colorado, respectively. Where a foreign judgment *was* held to be repugnant to California's public policy, the repugnancy was based on the violation of California's Uniform Child Custody Jurisdiction Act that would have resulted had the foreign order been enforced. *See In re Stephanie M.*, 867 P.2d at 716. The majority provides no explanation why the California courts would refuse to enforce a foreign judgment that violated a state statute, yet be willing to enforce a foreign judgment that violates the federal (and perhaps the state) Constitution.

The majority's dictum implying that foreign judgments that would be unconstitutional if entered by a U.S. court may nonetheless be enforceable is troubling. Under the principles articulated today, a foreign party can use a foreign court decree to censor free speech here in the United States on any range of subjects it finds objectionable — religion, democracy, gender equality — in the name of enforcing its own country's laws. The good intentions of even sympathetic foreign parties such as LICRA and UEJF in this case are not the standard. How could a California court honor the French defendants' good intentions in proscribing pro-Nazi speech when the City of St. Paul's good intentions did not cure its anti-hate speech code of viewpoint discrimination and constitutional infirmity even when directed at cross-burnings? *See R. A. V. v. City of St. Paul*, 505 U.S. 377, 392 (1992) ("St.

Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules."); *see also Collin v. Smith*, 578 F.2d 1197, 1201 (7th Cir.), *cert. denied*, 439 U.S. 916 (1978) (striking down on First Amendment grounds several Skokie, Illinois ordinances prohibiting the National Socialist Party of America from marching through the town: "First Amendment rights are truly precious and fundamental to our national life . . . . It is, after all, in part the fact that our constitutional system protects minorities unpopular at a particular time or place from governmental harassment and intimidation, that distinguishes life in this country from life under the Third Reich.")

People in the United States and France should abhor anti-Semitism and the horrors perpetrated by the Nazi Party. Nonetheless, our constitutional law differs from French jurisprudence in our approach to hate speech. Our law reflects deeply held political beliefs about freedom of expression in this country. Borrowing Justice Brandeis's formulation, "the remedy to be applied [to expose falsehood and fallacies] is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

### 3.  *The alleged lack of factual development*

Even accepting the majority's assumption that this case does not turn on purely legal issues, the concerns the majority invokes as reasons to withhold judicial resolution are either unconvincing or at most reasons for remand. For instance, the majority seems to call into question whether the French court's injunction is sufficiently final because the orders are labeled "interim," notwithstanding their unconditional and mandatory language. (Op. at 436.) In considering whether the injunction survives U.S. laws, we must take the orders issued by the French court as final actions, reflecting that court's view of Yahoo!'s conduct and current obligations under French law. There is no reason for us to assume that the French court intends something different from the words of its

own mandatory orders — just as we would not assume that a U.S. federal or state court would not stand by an injunctive order it has issued.

Moreover, by insisting on withholding judicial resolution, the majority disregards the district court's factual determinations, and its role in resolving factual disputes. First, with respect to the content at issue, the majority minimizes the district court findings that Yahoo! hosts content violating the specific terms of the orders. As the district court found, Yahoo! "continues to offer at least some Third Reich memorabilia as well as *Mein Kampf* on its auction site and permits access to numerous web pages with Nazi-related and anti-Semitic content." *Yahoo II*, 169 F. Supp. 2d at 1189. The district court took judicial notice from its own search of the site (in October 2001) that using the keyword "Nazi" called up 69 Nazi-related items posted for sale, such as stamps, coins and a copy of *Mein Kampf*. *Id.* at 1185 n.3. The district court also conducted keyword searches on Yahoo!'s general <yahoo.com> website, finding thousands of sites referring to "Jewish conspiracy," promoting modern-day Nazism or suggesting the Holocaust did not happen. *Id*. at n.4.[5]

Clouding the majority's view of the facts are the defendants' assertions before us and in the district court that they "have no present intention of taking legal action against Yahoo! in the United States" because they consider Yahoo! to be in "substantial compliance with the French order." *Yahoo II*, 169 F. Supp. 2d at 1188. But the French court has never made such a determination of Yahoo!'s alleged compliance. Instead, the majority speculates that because *Yahoo! France*

---

[5]The French defendants initially objected to a far broader array of content than the limited category of items Yahoo! now excludes under its revised auction site policy. UEJF's plea for relief asked the French court to mandate that Yahoo! remove from *all* browser directories the index heading entitled "negationists" and *any* link "bringing together, equating or presenting directly or indirectly as equivalent sites categorised under the heading 'Holocaust' and those indexed as negationist."

has "complied [in France] in large measure with the spirit and letter" of the May 22 French order, "compliance 'in large measure' by Yahoo! is very likely to be satisfactory to the French court." (Op. at 436-37.) But *Yahoo!* is not Yahoo! France, and the French court did not explain the factual basis for its finding of compliance.

Nor have the defendants ever taken any steps to stipulate in a legal forum that Yahoo! is in compliance with the injunction. Thus the district court properly gave no weight to the defendants' professions of Yahoo!'s substantial compliance. The court pointedly observed that the defendants "have not taken steps available to them under French law to seek withdrawal of the orders or to petition the French court to absolve Yahoo! from any penalty," *Yahoo II*, 169 F. Supp. 2d at 1188, and they gave no indication they would pursue such measures when pressed on the subject. *Id.* at 1189 n.7.

During oral argument before us, defense counsel conceded that the defendants did not want to foreclose their options by agreeing to such a stipulation. As the majority recognizes (Op. at 416), should Yahoo! alter its content in a way that the defendants disapprove of, they want the judicial authority to seek relief and mandate Yahoo!'s compliance. (Oral Arg. 1:02.) The majority in large part hinges its analysis on the defendants' litigation position of saying that they have no problem now with Yahoo!'s conduct but declining to take any steps to eliminate the speech injunction or accruing financial penalties. *See Abbott Laboratories*, 387 U.S. at 154 (concluding that the "subsequent representation of the Department of Justice" that it was likely to impose only civil sanctions for violations, thus mitigating the harm to the plaintiff, "should not suffice to defeat" the claim); *see also Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 617-18 (9th Cir. 1999) (disregarding attorney general's claim that she lacked authority to carry out specific threat of prosecution in holding that a real controversy existed for purposes of Article III).

The majority claims that "we do not know whether the French court would hold that Yahoo! is now violating its two interim orders." (Op at 436.) Ironically, the majority thereby highlights the very threat Yahoo! faces. Uncertainty about whether the sword of Damocles might fall is *precisely* the reason Yahoo! seeks a determination of its First Amendment rights in federal court. *See Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 n.13 (1991); *Chang v. United States*, 327 F.3d 911, 921 (9th Cir. 2003) (recognizing that this court does not require "Damocles's sword to fall" before it will adjudicate a case).

In sum, the uncertainties Yahoo! faces are not reasons to delay adjudication. Rather, they provide a compelling basis for a federal court to hear Yahoo!'s First Amendment challenge at this time, as the district court did.

> The fact that Yahoo! does not know whether its efforts to date have met the French Court's mandate is the *precise harm* against which the Declaratory Judgment Act is designed to protect. The Declaratory Judgment Act was designed to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure or never.

*Yahoo II*, 169 F. Supp. 2d at 1189 (emphasis added).[6] Instead,

---

[6] Yahoo!'s circumstances are readily distinguishable from those found not ripe in *Socialist Labor Party v. Gilligan*, 406 U.S. 583 (1972). There, the principal First Amendment claims the party leveled against Ohio's election code were mooted by legislative amendments, leaving only a subsidiary challenge to a loyalty oath. The Court found this claim "singularly sparse in its factual allegations," with no suggestion that the Party had ever refused or would refuse in the future to sign the oath, or that it had suffered or would suffer any injury from the existence of the oath requirement. *Id.* at 586.

Similarly, in *American-Arab Anti-Discrimination Committee v. Thornburgh,* 970 F.2d 501 (9th Cir. 1992), members of the Popular Front for the

the majority turns Yahoo!'s uncertainties against it — relegating it to the French courts for clarification and absolution.

B.   *Substantial hardship of withholding judicial consideration*

Even more perplexing is the majority's conclusion that Yahoo! does not face "substantial hardship" because of our unwillingness to adjudicate its First Amendment claim. The majority attempts to avoid the obvious chilling effect of an overbroad and vague injunction in two creative and troubling ways. First, the majority opines "with some confidence" that Yahoo! need not fear the enforcement of a fine because "it is exceedingly unlikely that the sword [of Damocles] will ever fall" (Op. at 441) — another speculative assessment, we submit. It also faults Yahoo! for failing to proffer examples of "anything that it is now not doing but would do if permitted by the orders" (Op. at 445) and thereby imposes a new, higher burden on a First Amendment plaintiff to establish a chilling effect.

---

Liberation of Palestine (PFLP) contended that anti-Communist provisions of the McCarran-Walter Act unconstitutionally put them at risk of deportation for engaging in protected First Amendment activities without the opportunity for a fair and impartial hearing before the INS. We held that the plaintiffs were sufficiently at risk of government prosecution to give them standing; but we found their claims not ripe because there was "a sketchy record . . . with many unknown facts," such as whether the plaintiffs were actually members of the PFLP or what acts the government alleged they had committed, and we emphasized that the INS had not yet interpreted or applied the challenged provisions. *Id*. at 510-11.

   In marked contrast to these cases, here the French injunction remains extant and as broadly worded as ever; the defendants have refused to stipulate to Yahoo!'s compliance; and the district court has found actual noncompliance with specific terms as well as an overall risk of noncompliance with fatally undefined terms — thereby subjecting Yahoo! to the risk of substantial monetary fines and the chilling effect of the vague and overbroad injunction. Additionally, there is no court or agency — other than this federal court — that can address Yahoo!'s United States constitutional claim.

### 1.  *The French orders chill speech*

First, the majority overlooks Yahoo!'s claim that it faces actual abridgment of its current speech — not just a chilling effect on its ever-changing Web content. As the majority does acknowledge, Yahoo! hosts content on its auction site, including the sale of *Mein Kampf*, that is specifically prohibited by the terms of the injunction. The district court's findings of impermissible material still present on the auction site demonstrate that Yahoo! is currently engaged in speech that the French orders — by their terms — *compel* it to foreclose to some users or forgo entirely. Yahoo! opts not to accede to the injunction, thereby incurring daily accumulating fines should its current or future behavior displease LICRA or UEJF. Certainly Yahoo! should not have to abstain from conduct it believes is constitutionally protected solely for us to find its claim ripe. *Cf. City of Auburn*, 260 F.3d at 1173 (9th Cir. 2001) (noting that finding case unripe would require party to comply with "costly and cumbersome" franchise requirements, only for the party to then raise "exactly the same argument that it makes here").

More importantly, the majority largely ignores the broad and diffuse scope of the French injunction — which extends well beyond Yahoo!'s auction site and clearly raises the question whether it is substantively possible for Yahoo! to comply. Apart from entirely obvious cases, how can one determine with any certainty whether something "may be construed as constituting an apology for Nazism or a contesting of Nazi crimes"? The majority makes the rather startling assertion that "[b]efore the district court can engage in useful factfinding, it must know whether (or to what extent) Yahoo! has already sufficiently complied with the French court's interim orders." (Op. at 449.) Of course, this is precisely the crux of Yahoo!'s predicament — and highlights the vagueness and overbreadth of the orders. We know the actions Yahoo! has taken and not taken with respect to Nazi paraphernalia appearing on its site. The only reason we cannot determine "whether (or to what

extent) Yahoo! has already sufficiently complied" with the French orders is because we cannot assess the scope of the orders themselves.[7] It is this very kind of uncertainty that epitomizes a purely legal question of facial infringement of First Amendment rights and the harms routinely associated with such an infringement.

In plain terms, if no one but the French court can decipher the meaning of its injunction aimed at Yahoo!'s speech, how can Yahoo! comply? Yahoo! has to know what content it has to screen from France-based users. The French orders contain no meaningful instructions for Yahoo! to winnow permitted speech from unpermitted speech. It is the absence of a discernible line between the permitted and the unpermitted that makes the orders facially unconstitutional. As the district court concluded, and as discussed previously, "compliance would still involve an impermissible restriction on speech" because it would require Yahoo! to interpret the vague and overbroad injunction as to what content is prohibited and which users should be denied access, on pain of substantial penalty should it guess wrong. *See Yahoo II*, 169 F. Supp. 2d at 1193-94.

Ultimately, the majority's parsimonious treatment of the free speech issues here culminates with its reducing Yahoo!'s argument to an interest in merely "allowing access by users in France" to Nazi materials. (Op. at 446.) Yahoo! is allegedly seeking "a First Amendment right to violate French criminal law and to facilitate the violation of French criminal law by others."[8] (Op. at 446.) Notably, even the defendants have not

---

[7]It is telling that even the Internet experts relied upon by the French court were unable to recommend a "suitable and effective technical solution" for Yahoo! to screen out France-based users from any of its sites or services, other than the auction site, that may be construed as constituting an apology for Nazism or a contesting of Nazi crimes because "[n]o grievance against any . . . Yahoo! sites or services [other than the auction site] is formulated with sufficient precision."

[8]According to the majority, "the French court's interim orders do not by their terms require Yahoo! to restrict access by Internet users in the United

construed Yahoo!'s First Amendment argument in such crabbed terms.

But suppose Yahoo! really were concerned only with not having to act *in the United States* as an enforcer of France's restrictions on Internet access by France-based users. That would not make the constitutional implications of the effects on Yahoo!'s United States operations go away. Yahoo! cannot merely act in France to restrict access by users located in France; the French orders require Yahoo! to make changes to its servers and protocols in the United States. That Yahoo! seeks First Amendment protection from having to compromise its domestic operations to comply with a foreign injunction does not translate into its seeking the right simply to violate French law. This case is *not* about the extra-territorial application of the First Amendment; it *is* about the extra-territorial application of France's anti-Holocaust denial speech codes and the extent to which compliance may infringe Yahoo!'s rights of free speech here in the United States.

The majority, however, views the French orders as concerning "speech accessible solely by those outside the United States." (Op. at 440.) Additionally, it accepts that Yahoo! can screen out access to any prohibited materials by "most" —

States." (Op. at 446.) This is not Yahoo!'s position. The company has asserted that complying with the French orders would compel it to remove prohibited material from its United States-based Internet services and reengineer its servers, also located in the United States, to identify both France-based users and prohibited material that may be posted in the future; therefore, it may not be possible to comply with the French orders without rendering certain content inaccessible to *all* users, including those in the United States and not just those in France. Nor does Yahoo! appear to be interested in asserting its constitutional rights solely for the sake of violating French law. To comply with the orders as they affect the company's French services, Yahoo! now removes any posted material it becomes aware of on its <fr.yahoo.com> site that would violate French law.

estimated to be 70-90% — of France-based users. (Op. at 438.) This reasoning is flawed in several respects.

First, Yahoo! does not target specific users by initiating content directed solely at them. Rather, anyone who logs on to <yahoo.com>, including users in France, gains access to material on Yahoo!'s message boards, search engines, auction sites and other services. It is the *accessing* of vaguely and overbroadly described content — by anyone in French territory — that the orders prohibit and hold Yahoo! responsible for preventing. Thus, even if one could readily and reliably limit the universe of Internet users whose access must be censored — an assumption the record before us does not justify — Yahoo! would still be at a loss to define the universe of content it must censor.

Second, the factual question of whether it *is* technologically feasible for Yahoo! to monitor the postings and filter the millions of users accessing the <yahoo.com> website — assuming such technology actually bears on Yahoo!'s First Amendment claims — is an *unresolved* issue that should be returned to the district court. The parties have not addressed the specifics of technical feasibility issue on this appeal, nor the validity of the experts' report. Thus the 70% and 90% figures the majority adopts from that report depend solely on the majority's reading of a translated technical and ambiguous document, the scientific merits of which have not been addressed even in the district court. LICRA and UEJF did raise the issue of feasibility below, but the district court denied them discovery regarding technological feasibility of screening France-based users because it deemed the issue immaterial to the court's First Amendment ruling. *See Yahoo II*, 169 F. Supp. 2d at 1194. The defendants *have not appealed* either the district court's First Amendment decision or its discovery ruling. To the extent that the technological feasibility issue has been argued at all on appeal, Yahoo! has said that it "could not monitor the content of these millions of postings and listings to its U.S.-based Internet services" and that it

essentially faces a binary choice between self-censorship and paying the French fines.

On the record before us — lacking expert testimony and cross-examination, much less district court findings of fact — we do not believe we as appellate judges can or should accept as a given that Yahoo! can readily and reliably identify 70% of the users it must censor, "irrespective of whether a Yahoo! user sought access to an auction site, or to a site denying the existence of the Holocaust or constituting an apology for Nazism." (Op. at 414-15.)

This is particularly true given that the experts' report is replete with hearsay, technological assumptions and disclaimers. Most importantly, the experts explicitly limited their analysis to how an Internet "surfer" in France could be prevented from accessing prohibited content *only* on Yahoo!'s *auction* site, not all such content that might find its way onto <yahoo.com> generally. As the experts emphasized — echoing Yahoo!'s own concern about the imprecision of the orders:

> The decisions of the [French] court and the demands made are precisely directed against the auctions site. *No grievance against any other Yahoo! sites or services is formulated with sufficient precision to enable the consultants to propose suitable and effective technical solutions.* In these circumstances, the consultants will therefore confine their answers to the matter of the auctions site. . . .[9]

---

[9]Even as to screening content on the auction site, the experts acknowledged that it was not possible for Yahoo! to "exclude *a priori* items which have not been described by their owner as being of Nazi origin or belonging to the Nazi era." How then would Yahoo! keep the prohibited material from being accessed? The report suggested that a more "radical solution" might be warranted, essentially prohibiting any search containing the word "Nazi" by an identified French user. How such Nazi paraphernalia which has not been described by its owners with the label "Nazi" could be screened remains a mystery.

(Emphasis added.) The experts also emphasized, "[t]he measures to be taken depend upon the particular case in point. They cannot be generalised to all sites and services on the Internet. In this case, the site in question is *pages.auctions.yahoo.com.*" (Emphasis added.)

Of course, the French orders do not solely prohibit content on Yahoo!'s auction site but, by their terms, encompass content on *all* of Yahoo!'s services. Yahoo!'s services extend far beyond its auction site and include its search engine, e-mail, classified listings, personal Web pages, shopping, message boards, chat rooms and news stories.

The majority — like the French court itself — seems to credit two of the three experts who estimated as many as 90% of France-based users of Yahoo's auction site could be identified and screened. The methodology underlying this estimate, however, further illustrates the uncertainty of predicting Internet identification and screening, compounded by the vague and overbroad mandate of the court orders. Assuming that "70% of the IP addresses assigned to French surfers can be matched with certainty to a service provider located in France, and can be filtered," all three experts agreed that "no filtering method is capable of identifying all French surfers or surfers connecting from French territory."[10] To reach 90%, two experts relied on a voluntary "sworn declaration of nationality" by a French surfer that "could be made when a first connection is made to *a disputed site*, in this case the *Yahoo auctions site* . . . ." (Emphasis added.)[11] They suggested ask-

_____

[10]Significantly, the experts were at pains to caution that even the 70% figure based on IP addresses has a short shelf life: "[t]he consultants stress that there is no evidence to suggest that the same will apply in the future. Encapsulation is becoming more widespread, service and access providers are becoming more international, and surfers are increasingly intent on protecting their rights to privacy."

[11]Notably, the French orders compel Yahoo! to prohibit access by *any* users in *French territory*, not just French citizens. Thus a declaration of "nationality" does not seem adequate in any event.

ing for the declaration of nationality at "the home page of the auctions site" or "in the context of a search for Nazi objects if the word 'Nazi' is included in the user's request . . . ." In short, the experts' 90% figure depends on the ability to link users to a *specific* Yahoo! site and to specific content *on* that site.

The third expert, Vinton Cerf, a 1997 recipient of the United States National Medal of Technology for co-designing the architecture of the Internet,[12] disavowed relying on users' self-identification at all, concluding that "it does not appear to be very feasible to rely on discovering the geographic locations of users for purposes of imposing filtering of the kind described in the [French] Court Order."

Given the orders' broad language, none of the experts could devise a system for screening out France-based users that went beyond the auction site. Therefore, even if were true that Yahoo! can identify up to 70% of all of its France-based users, irrespective of the site or service they are accessing, the evidence is clear that geographical identification alone would not enable Yahoo! to prohibit such users from accessing 100% of the *content* proscribed by the French orders — indeed, Yahoo! could not even come close on that side of the compliance equation.

There are other serious questions about the experts' report that should be part of an evidentiary hearing in the district court. For example, the 70% IP-address screening figure was derived in part from information provided by a French Internet association regarding how many of its access providers can identify whether their users are located in France. Such anecdotal data do not demonstrate conclusively that Yahoo! itself has the capability to identify the location of its users.

---

[12]*See* Technology Administration, Department of Commerce, *The National Medal of Technology Recipients*, *at* http://www.technology.gov/Medal/Recipients.htm.

Indeed, the method the experts proposed for Yahoo! to iden-tify users is imprecise. The experts noted that for a number of reasons the "real world" location of a user may not be readily identifiable. For instance, a French citizen who uses AOL for Internet service may be shown as having an IP address from Virginia, where AOL's network is located. In other instances, users may choose to mask the geographical origin of their Internet address.

Thus we cannot assume, as does the majority, that this case is about Yahoo! restricting access only by French users, 70-90% of whom are readily identifiable regardless of what con-tent they may seek out on <yahoo.com>. The validity of these percentage assumptions not only drives the majority's defini-tion of whose access is restricted, but also its apparent will-ingness to assume that even if Yahoo! can identify only 70% of the prohibited universe of users, that would be good enough. If technical feasibility is to be the lynchpin on which Yahoo!'s day in federal court depends, then let the parties return to the district court for proper factfinding. Instead, the majority preempts the district court's factfinding function, interpreting the French experts' report as conclusive evidence in order to deny Yahoo! access to the court altogether.

Lastly, there is the issue of cost of compliance. There can be no dispute that the very nature of the French orders puts Yahoo! to the choice of incurring the costs to develop and implement mechanisms to filter out individual users based on location or removing content from its service altogether. This type of immediate financial burden clearly suffices to make a case ripe for adjudication, even if we accept the majority's proposition that the threat of enforcement is remote. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 197-98 (1983) (holding ripe for review a preemption challenge to a regulation imposing a moratorium on new nuclear plants because petitioners would face substantial financial hardship if they built plants while hoping the law would be struck down); *City of Auburn v.*

*Qwest Corp.*, 260 F.3d 1160, 1173 (9th Cir. 2001) (noting that finding case unripe would require party to comply with "costly and cumbersome" franchise requirements).[13]

### 2. *The enforceability of foreign penal judgments*

Recognizing that the risk of a large monetary penalty must inevitably weigh heavily in Yahoo!'s assessment of its options, the majority tries to neutralize the risk — creating a protective shield by invoking the doctrine that United States courts will not enforce the penal judgments of other countries. It thus assures Yahoo! that "even if the French court were to impose a monetary penalty against Yahoo!, it is exceedingly unlikely that any court in California — or indeed elsewhere in the United States — would enforce it" because it is a penal judgment. (Op. at 442.)

It is true as Justice Marshall observed that "[t]he courts of no country execute the penal laws of another," *The Antelope*, 23 U.S. (10 Wheat.) 66, 123 (1825). But that begs the question whether the French injunction itself or the accruing fines are truly penal. Although we respect the majority's scholarship, this issue has not been the focus of the parties' briefs or arguments, and thus we cannot share the majority's level of confidence that its dictum is sufficiently accurate — or binding — that we should remove the risk of a substantial, retroac-

---

[13]The mere possibility of future fines can have very real financial consequences for a publicly held corporation like Yahoo!. To the extent it is material to a corporation's financial condition, such companies are required to disclose contingent liabilities in Form 10-Q and 10-K statements filed with the Securities and Exchange Commission. *See* Securities Exchange Act of 1934, §§ 10(b), 15(d), 15 U.S.C. §§ 78j(b), 78o(d); 17 C.F.R. §§ 240.10b-5, 240.12b-20; *see also* Financial Accounting Standards Board Statement of Financial Standards No. 5, *available at* http://www.fasb.org/pdf/fas5.pdf. Such filings may adversely affect the credit ratings and hence the valuation of shares of such companies. In another context, we have held that financial impacts on a business resulting from legal uncertainty support a finding that a case is ripe. *See Chang v. United States*, 327 F.3d 911, 922 (9th Cir. 2003).

tive monetary penalty from the First Amendment or ripeness analysis. As with the French defendants' assurances that they consider Yahoo! currently in substantial compliance, absent a binding court order actually freeing Yahoo! from the enforcement of the French orders, Yahoo! remains at serious risk if it fails to conform its web content to the dictates of those orders.

"The test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual . . . ." *Huntington v. Atrill*, 146 U.S. 657, 668 (1892). The Court warned against the "danger of being misled by the different shades of meaning allowed to the word 'penal' in our language." *Id.* at 666.[14] Determining whether a sanction is penal or civil in nature is not always a simple task. *Cf. F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1137-38 (9th Cir. 2001) (establishing procedural protections due a party based on whether sanctions were criminal or civil in nature).

Although LICRA and UEJF's substantive claims against Yahoo! in French court depended in part upon Yahoo!'s violations of French criminal law,[15] the record suggests that the

---

[14]The Supreme Court's warning in *Huntington* has even greater salience when we are attempting to determine "the different shades of meaning allowed to the word 'penal' " in a language *other* than our own. (Op. at 443.)

[15]LICRA and UEJF's claims are based in part on a French law that criminalizes the public wearing or display of the uniforms, insignias and emblems of any organization declared criminal by the post-World War II International (Nuremberg) Military Tribunal (e.g., the Nazi Party). *See* C. Pén. R645-1. One of the most serious penalties for violation of this provision of the penal code is a fine. *See id.* Their claims also appear to rely on the French Law of July 29, 1881 (Law on Freedom of the Press) (2004), which, among other things, criminalizes Holocaust denial, *see* art. 24 bis, and the incitement of discrimination, hatred or violence on the basis of belonging to a particular ethnic, national, racial group, *see* art. 24, ¶ 6. Both crimes carry a penalty of one year imprisonment or a fine of 45,000 Euros or both. *See id.*

French lawsuits were civil rather than criminal and, more importantly, that the French orders primarily sought to redress a wrong to LICRA and UEJF rather than a wrong to the French public. Of course, we agree with the majority that "the label 'civil' does not strip a remedy of its penal nature." (Op. at 444.) However, that still begs the question whether or not the French accruing fines were penal. On this point, the majority asserts that there is some language in the November 20 order that supports the characterization of the fines as penal and that in any event the fines are potentially much larger than the nominal damages awarded to UEJF and therefore the "award of one Franc [to UEJF] cannot render the orders primarily remedial rather than punitive in nature." (Op. at 445.) The majority cites no authority for the novel arithmetic balancing test it proposes to distinguish penal from non-penal orders, and although we admit there is some language in the orders that supports holding the French orders punitive, there is also significant language that supports the conclusion that the orders sought to redress a wrong done to LICRA and UEJF. The proper test for determining whether the French orders are penal is a purposive one, *see Huntington*, 146 U.S. at 668, and based on the record before us, we do not share the majority's certainty that the orders are undoubtedly penal in nature.

French law gives standing to public interest, non-governmental organizations dedicated to defending the interests of members of certain victimized groups, including victims of the Holocaust (*déportés*), to initiate enumerated types of civil actions (but not criminal prosecutions) on behalf of such victims. *See, e.g.*, C. Pr. Pén. arts. 2-4 & 2-5; Law of July 29, 1881 (Law on Freedom of the Press) (2004), art. 48-2. Yahoo!'s challenge to UEJF's standing under Article 48-2 of the French Law on Freedom of the Press and the French court's subsequent finding that LICRA and UEJF "are dedicated to combating all forms of promotion of Nazism in France" suggest that the French trial was a civil proceeding under one of the specialized French standing statutes. This

conclusion is further supported by the French court's reliance on Article 809 of the New Code of *Civil* Procedure for its authority to issue orders.

Furthermore, the award of damages to UEJF and other relief "by way of restitution" strongly suggests that the French court orders were predominantly civil and remedial rather than penal.[16] The court based its award of damages and other restitution in its May 22 decision on a finding that the exhibition for sale of Nazi objects "has caused damage to be suffered by LICRA and UEJF." The French court reiterated this finding of direct harm in its November 20 decision: "this display [of Nazi objects] clearly causes damage in France to the plaintiff associations who are justified in demanding the cessation and reparation thereof." In this context, the additional relief afforded to the French plaintiffs — an injunction ordering Yahoo! to cease its harmful activity in France — appears to be merely an additional remedy in a civil suit.

As with the French injunction, the accruing fines are similarly more likely civil than penal in nature. The most natural reading of the French court's rationale for imposing the accruing fines is that such fines were meant to coerce Yahoo! into compliance with the substance of the French injunction. Rather than assessing the fines retroactively as a court would do when redressing the public wrong Yahoo! had allegedly *already* committed, the French court made the fines entirely conditional on Yahoo!'s future behavior beginning three months after the date of the second French order.

The U.S. analogue for such a regime of per diem fines is civil contempt. *See Sarl Louis Feraud Int'l v. Viewfinder Inc.*,

---

[16]The French court ordered payment by Yahoo! (jointly and severally with Yahoo! France) of provisional damages of 1 Franc to UEJF. As a means of effecting restitution for the harm suffered, the French court also ordered Yahoo! to pay for the publication of one of the French decisions in "five daily or weekly publications at the choice of [UEJF]."

2005 U.S. Dist. LEXIS 22242, at *2, *7 (S.D.N.Y. 2005) (characterizing a French court's judgments and a "fine ('*astreinte*') of 50,000 francs per day for each day that Viewfinder failed to comply with each judgment" as "an injunction backed by coercive penalties analogous to a civil contempt fine under American law"). "In contrast [to criminal contempt], civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience." *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 827 (1994). *See also* 17 C.J.S. *Contempt* § 64 (2005) ("[C]ontempt proceedings brought to vindicate the dignity and authority of the court may be characterized as criminal in nature, whereas those brought to preserve and enforce the rights of private parties are remedial and civil in character."). Courts have the power to order either imprisonment or the payment of fines when holding a party in civil contempt: "A close analogy to coercive imprisonment is a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order. Like civil imprisonment, such fines exert a constant coercive pressure." *Bagwell*, 512 U.S. at 829. *See also People v. Gonzalez*, 910 P.2d 1366, 1373 (Cal. 1996).[17]

---

[17]Admittedly, the characterization of the fines as coercive yet non-penal may depend on whether Yahoo! "is afforded an opportunity to purge" its liability to pay the fines. *Bagwell*, 512 U.S. at 829. Alternatively, the fines may be compensatory and therefore non-penal if they are payable to LICRA and UEJF "for losses sustained" rather than to the French government. *See id.* The majority claims that the "penalties are payable to the government and not designed to compensate the French student groups for losses suffered." (Op. at 444.) However, nothing in the record indicates to whom the fines are payable. Furthermore, the majority fails to acknowledge the possibility, indeed the probability, that the fines were not designed to punish Yahoo! for its past behavior, but rather to prevent future harm to LICRA and UEJF. Coercive per diem fines need not be "designed to compensate [plaintiffs] for losses suffered" (Op. at 444), in order to be non-penal, so long as their purpose is to "preserve and enforce the rights of private parties," 17 C.J.S. *Contempt* § 64 (2005). In any event, such uncertainty concerning the nature of the fines merely reinforces the conclusion that further factfinding by the district court is necessary before we can jump to the conclusion that the French fines are penal and unenforceable.

Yahoo! was afforded a three-month safe harbor to allow it to implement the French court's orders, and only then would any fines be assessed. As with a U.S. civil contempt order, the fines were entirely "avoidable through obedience." Because the French coercive fines' aim is enforcement of an underlying injunction that is civil (preventing the continuation of harm the French court found LICRA and UEJF had already suffered) rather than penal (benefitting French public justice or vindicating the French court's dignity and authority), the California rule of comity announced in *In re Stephanie M.* might well apply, were it not for the orders' substantive unconstitutionality.[18] *See* 867 P.2d at 716.

For these reasons, unlike the majority we cannot take the monetary penalty out of the ripeness analysis and assume that Yahoo! is not harmed by the very threat of the French orders' possible enforcement. Once again, at the least this is another issue that could and should be remanded to the district court for appropriate briefing and factfinding.

### 3.  *A new, higher burden for proving chilling effect*

Finally, the majority dismisses the chilling effect of the orders by placing the burden on Yahoo! to identify *other* speech it wants to engage in but which is foreclosed by the French orders. What more should Yahoo! have to specify

---

[18]Even if the exact accruing fines as calculated by the French orders were not directly enforceable under California law, Yahoo! could face the possibility that a California court would enforce a foreign injunction with its own state contempt proceedings under comity doctrine (again, assuming no substantive constitutional defect). *Cf. Biewend v. Biewend*, 109 P.2d 701, 704 (Cal. 1941) ("Upon the basis of comity, however, as distinguished from the requirements of full faith and credit, the California courts have in numerous cases ordered that a foreign decree for future payments of alimony be established as the decree of the California court with the same force and effect as if it had been entered in this state, including punishment for contempt if the defendant fails to comply."), *overruled on other grounds by Worthley v. Worthley*, 283 P.2d 19, 22-23 (Cal. 1955).

about the exact manner in which the objectionable content would appear on its site? Millions of postings and other material flow through Yahoo!'s networks each day.[19] Yahoo! cannot possibly predict when and how specific content prohibited by the French orders will make its way onto its service. For example, a user could decide at any time to post a message or a link to a website containing impermissible content. Because it acts as a platform for other speakers, Yahoo! cannot, as the majority demands, identify the specific speech it wishes to engage in that is prohibited by the injunction.

Nor should it have to. To place such a requirement on an Internet provider — essentially forcing it to speculate as to the particular speech activity its millions of users "might" engage in as senders or recipients — is to afford it no First Amendment protection at all. As the Supreme Court has recognized, " '[t]he Internet . . . offer[s] a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.' " *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 566 (2002) (quoting 47 U.S.C. § 230(a)(3) (1994 ed., Supp. V)); *see Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (emphasizing that Congress, in insulating Internet service providers from liability for certain content published on their sites, recognized the importance of protecting the "unfettered and unregulated development of free speech on the Internet").[20]

---

[19]The record indicates that as of July 2000, Yahoo! and its subsidiaries had 146 million users worldwide. Each month Yahoo! users added or edited more than 15 million Geocities web pages and posted more than 6 million classified advertisements. There were more than 2.5 million active auction items viewable on Yahoo! each day and 200,000 Yahoo! clubs were accessed each day by members who posted messages, uploaded photos or added Internet links.

[20]*Batzel* analyzed the rationale for the provisions protecting Internet providers under 47 U.S.C. § 230, which Yahoo! invoked before the district court as a statutory basis for preventing enforcement of the French court orders here.

The majority would impose on Yahoo! far greater burdens and litigation risks than those alleging First Amendment violations by domestic parties would have to bear. Yahoo! is expected to try to persuade the French court to narrow or eliminate the very injunction Yahoo! has unsuccessfully fought against in France from the beginning. Unconstrained by our First Amendment, the French court might well take the opportunity to sanction Yahoo! for noncompliance — and do nothing to alleviate the sweeping restraint on the content of the <yahoo.com> website. If the defendants want to narrow the injunction such that it might warrant comity, that burden should fall on them, not Yahoo!.

But even if Yahoo! went to the French court and obtained a ruling that its current auction site policy and Internet services content comply with the orders, that would not resolve Yahoo!'s First Amendment problem unless the sweeping injunction itself were permanently withdrawn or narrowed. All Yahoo! would obtain would be clearance for its *current* operations; it would remain exposed to the risk of violating the orders and incurring penalties should it deviate from those current practices or should the defendants decide that Yahoo!'s content has become objectionable. The very nature of Yahoo!'s business is inherently mutable — that is the essence of the Internet, because of the sheer number and constantly changing identity of its users and of the content those users may seek or themselves post on <yahoo.com>. Only a United States court can provide Yahoo! with a legal resolution of its claim that the injunctive order, as written, cannot be enforced in the United States without infringing the company's First Amendment rights, thereby relieving it of the coercive threat hanging over its website and the operation of its business. By denying adjudication, the majority abdicates our proper role in protecting Yahoo!'s constitutional rights.

In so doing, it leaves in place a foreign country's vague and overbroad judgment mandating a U.S. company to bar access to prohibited content by Internet users from that country. This

astonishing result is itself the strongest argument for finding Yahoo!'s claims ripe for adjudication. Are we to assume that U.S.-based Internet service providers are now the policing agencies for whatever content another country wants to keep from those within its territorial borders — such as, for example, controversial views on democracy, religion or the status of women? If the majority's application of the First Amendment in the global Internet context in this case is to become the standard — whether as a matter of constitutional law or comity — then it should be adopted (or not) after full consideration of the constitutional merits, not as a justification for avoiding the issue altogether as not ripe for adjudication.

### III.   Conclusion

Without doubt, the hateful speech the defendants in this case seek to suppress is to be condemned. But censoring speech we find repugnant does not comport with our cherished First Amendment. It is well-settled that a hate speech code which "prohibits otherwise permitted speech solely on the basis of the subjects the speech addresses" is "facially unconstitutional." *R. A. V.*, 505 U.S. at 381. Under the majority's reasoning, a party targeted for enforcement of a foreign judgment restricting its speech in the United States will have no recourse but to appeal to the foreign court, which does not recognize the First Amendment, to try to escape the strictures of the decree — or to demonstrate compliance, either through voluntary action or by submitting to its terms. Only after enduring the decree's chilling effects while this process plays out, and then faced with whatever sanction the foreign court may impose for noncompliance, may the doors of the United States District Court be opened.

We should not allow a foreign court order to be used as leverage to quash constitutionally protected speech by denying the United States-based target an adjudication of its constitutional rights in federal court. By invoking the doctrine of prudential ripeness — notwithstanding having found both per-

sonal jurisdiction over the two foreign defendants and a constitutional case or controversy — the majority does just that, denying Yahoo! the only forum in which it can free itself of a facially *unconstitutional* injunction. Moreover, in doing so the majority creates a new and troubling precedent for U.S.-based Internet service providers who may be confronted with foreign court orders that require them to police the content accessible to Internet users from another country. We therefore respectfully dissent from the majority's ripeness decision.